James **LATTIMORE**, Petitioner,

v.

Larry E. **DuBOIS**, Respondent.

No. Civ.A. 97–11011–NG.

United States District Court,
D. Massachusetts.

July 13, 2001.

granting certiorari on a case from the Florida Supreme Court. *See Florida v. Thomas,* ⸺ U.S. ⸺, 121 S.Ct. 755, 148 L.Ed.2d 659 (2001) (granting writ of certiorari). However, finding that it lacked jurisdiction, the Court was unable to reach the merits of the case. *See Florida v. Thomas,* ⸺ U.S. ⸺, ⸺, 121 S.Ct. 1905, 1910, 150 L.Ed.2d 1 (2001). In the present case, Rivera emerged

from the vehicle, pushed the police officer who was a few steps from the rear of the vehicle, and ran a few steps past the cruiser when he was tackled to the ground and arrested. Because this case is resolvable under the automobile exception, I need not determine the much closer question as to whether the blurred bright line rule of *Belton* justifies this search.

Failure of trial judge to instruct on manslaughter in Massachusetts capital murder trial did not result in a fundamental miscarriage of justice, as required for federal habeas relief; although petitioner introduced sufficient evidence to warrant an instruction on his theory of the case, jury might have rejected the claim of provocation and concluded that petitioner acted with the malice aforethought necessary to make an unlawful killing murder.

---

James Lattimore, Norfolk, MA, Pro se.

Martin Richey, Federal Defender Office, Boston, MA, for Petitioner.

Cathryn A. Neaves, Attorney General's Office, Pamela L. Hunt, Attorney General's Office, Criminal Bureau, David E. Edmonds, Assistant Attorney General, Boston, MA, Susanne G. Levsen, Assistant Attorney General, Criminal Bureau, Linda Wagner, Assistant Attorney General, Criminal Bureau, Boston, MA, for Respondent.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

II. FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
 A. Trial Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
 B. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :. . . 74
 1. The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
 2. Post Conviction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

III. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
 A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . : . . . . . . . . 77
 B. Were Lattimore's Claims Procedurally Barred? . . . . . . . . . . . . . . . . . . . . . . . . . . 77
 1. Was the manslaughter instruction claim procedurally defaulted under state law? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
 2. Was the procedural default the basis for the state court's denial of relief? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
 3. Was there a cognizable excuse for the default and did the failure to consider the claim prejudice the defendant ("cause and prejudice")? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
 a. Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
 b. Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
 C. Appellate Counsel's Failure to Raise the Trial Court's Refusal to Instruct on Manslaughter on Direct Appeal Denied Petitioner the Effective Assistance of Counsel (Claim Two) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
 1. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
 2. Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
 3. Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

D. That the Trial Court's Failure to Instruct the Jury on Voluntary Manslaughter Created a Miscarriage of Justice (Claim One) .................... 89

IV. CONCLUSION ................................................................. 91

## I. *INTRODUCTION*

Petitioner James Lattimore ("Lattimore") brings this action for a writ of habeas corpus challenging his state conviction under 28 U.S.C. § 2254. Lattimore was convicted of first degree murder for the killing of Robert Phillips ("Phillips") on October 3, 1981, as well as for armed assault with intent to commit murder, and assault and battery by means of a dangerous weapon.

Before considering the merits of a habeas petition, I am obliged to parse the claim with care, evaluating if the petitioner has complied with the myriad technicalities of habeas law. But that approach—important though it may be—sometimes runs the risk of obscuring the issues, making it hard to see the forest for the trees. Therefore, before proceeding with an in-depth analysis of the case, I outline his claims and my concerns in broad strokes.

The record is clear about this much: Lattimore's actions on the evening of October 3, 1981, the date of the killing, reflect a misguided effort to protect his girlfriend, Linda Smith ("Linda"), from her ex-husband, Glen Smith ("Smith"). Phillips was an unintended victim of the shooting. Linda Smith had been the object of a sustained campaign of domestic violence, at a time before such issues captured significant public attention. When Smith threatened Linda in the presence of her friends and neighbors, a melee ensued, with others—not just Lattimore—embroiled. Lattimore had a gun and shot wildly, wounding Smith and killing Phillips.

At the close of the evidence, Lattimore's counsel requested a manslaughter instruction. The facts, he claimed, supported the inference that the killing was committed "in a sudden transport of passion or heat of blood." The trial judge not only refused to give the instruction; he warned the jury that this was *not* a manslaughter case. There were, he said, no "extenuating circumstances." Trial counsel strenuously objected. Lattimore was convicted of first degree murder. He has served twenty years of that sentence.

The core problem is that while trial counsel preserved the manslaughter instruction issue, appellate counsel did not.

The Supreme Judicial Court of Massachusetts ("SJC") affirmed the convictions, but exercised its authority pursuant to M.G.L. c. 278 § 33E to reduce the verdict to second degree murder. *See Commonwealth v. Lattimore*, 396 Mass. 446, 486 N.E.2d 723 (1985). The court's characterization resonates "extenuating circumstances": Smith, the SJC found, had "assaulted his former wife," "terrorized and harassed the neighbors," and "instigated" a neighborhood brawl in which Lattimore joined, firing his gun wildly. *Id.* at 453, 486 N.E.2d 723.

The SJC, however, went no further. The only issues that appellate counsel had raised before the court were plainly without merit. And the one compelling issue— the trial court's failure to instruct on manslaughter—was never mentioned.

Thereafter, when Lattimore tried to raise the manslaughter instruction claim, he found himself in the "Alice in Wonderland" world of post-conviction practice.[1]

---

1. "Tut, tut, child," said the Duchess. "Every- thing's got a moral if only you can find it."

After a conviction is affirmed on direct appeal, the path to relief is uphill.[2] The law is concerned about the finality of decisions. There is no entitlement to counsel; the burden of proof is against the petitioner. A court that has affirmed a conviction once is likely to look askance at subsequent challenges.

But Lattimore persisted. He moved for a new trial on the manslaughter issue, asked to have counsel appointed, and to amend his motion if necessary after counsel reviewed it. What he did not do, however, was challenge the failure of appellate counsel to raise the instruction issue on direct appeal.[3] The trial court denied the motion, without appointing counsel, without calling for responsive pleadings (which would have alerted Lattimore to the significance of the procedural default), without holding a hearing, and without making findings.

On appeal again, now from the trial judge's denial of the motion for a new trial, Lattimore renewed his request for counsel.

After some additional procedural turns, the Appeals Court agreed. But new appellate counsel pressed only the claims which had been raised below—again, the instruction issue, not the ineffectiveness of prior appellate counsel. And again, Lattimore lost. The instruction question had not been presented on direct appeal, and the reason for that failure—appellate counsel's ineffective assistance—was not before the court on the appeal of the denial of the motion for a new trial.

By the time of his second motion for a new trial, Lattimore, again *pro se*, finally got it right, challenging the quality of appellate counsel's representation in his direct appeal. But it was too late. The trial court would not listen because Lattimore had not raised the claim earlier.

In short, underneath the layers and layers of proceedings, lies a substantial issue, vigorously preserved by trial counsel, fairly raised by the evidence, central to the defense—which, because it was missed by

---

*Alice's Adventures in Wonderland* by Lewis Carroll (Charles Lutwidge Dodgson), Chap. viii.

2. As I said in my August 9, 1999 *Memorandum and Order for Disclosure by November 15, 1999* in *Drumgold v. Dubois*, No. 97CV–11607–NG:

> When a defendant claims his innocence before trial, the system responds in force: He is presumed innocent, he has the benefit of substantial discovery of the case against him, and he has the full panoply of the protections provided under the Bill of Rights. After a conviction, the balance is shifted: He is 'proclaimed' guilty, and thereafter provided with substantially fewer avenues of redress and procedural protections.

3. Had he been prescient and read the Supreme Court advance sheets, Lattimore might have realized that years later the Supreme Court would answer the following question in the affirmative:

> Whether a federal habeas court is barred from considering an ineffective-assistance-of-counsel claim as 'cause' for the procedural default of another claim when the ineffective-assistance-claim is itself procedurally defaulted?

But therein lies the problem, as Justice Breyer wrote, concurring in *Edwards v. Carpenter*, 529 U.S. 446, 454, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (Breyer, J., concurring).

> ... The question's phrasing itself reveals my basic concern. Although the question, like the majority's opinion, is written with clarity, few lawyers, let alone *unrepresented state prisoners*, will readily understand it. The reason lies in the complexity of this Court's habeas corpus jurisprudence—a complexity that in practice can deny the fundamental constitutional protection that habeas corpus seeks to assure. Today's decision unnecessarily adds to that complexity, and cannot be reconciled with our consistent recognition that the determination of 'cause' is a matter for the federal habeas judge.

(emphasis added).

appellate counsel in the first instance, was never carefully addressed by any court thereafter.

Lattimore makes the following arguments before this Court: 1) The trial judge failed to instruct the jury on voluntary manslaughter, a failure which amounted to a miscarriage of justice. But before a court can consider that issue, it must address the fact that the claim was procedurally defaulted; Lattimore never raised it on direct appeal. 2) Lattimore justifies his failure to raise the instruction issue on direct appeal because of appellate counsel, who fundamentally dropped the ball. 3) And these same deficiencies provide a second, independent ground for relief—ineffectiveness of appellate counsel. But before a court can consider the ineffectiveness of appellate counsel, it must address the fact that this claim was also defaulted; Lattimore did not raise it the first time he could have, on his motion for a new trial.

I conclude that Lattimore's appellate counsel did not provide effective assistance of counsel; his failure to raise a compelling and important issue on appeal—the manslaughter instruction question—is simply incomprehensible. And I find that Lattimore's failure to raise an ineffective assistance of counsel issue in a timely fashion is excused because of the very unusual facts of this case: The trial judge, on notice that the SJC's view of the case contradicted his own, that the SJC's decision strongly suggested manslaughter when the trial judge had told the jury that there were no "extenuating circumstances," nevertheless failed to appoint counsel, hold a hearing, ask for responsive pleadings, or make findings. Lattimore, *pro se*, pressed the manslaughter claim, but plainly did not understand that he also had to explain why it had not been raised on direct appeal. He was not familiar with the habeas corpus

maze. Nothing about the post-conviction proceedings in the trial court helped him understand what his rights were.

After reviewing the trial record submitted to me and the post conviction pleadings, I **GRANT** Lattimore's writ of habeas corpus.

## II. *FACTS*

### A. *Trial Summary*

In 1978, following a tumultuous nine-year marriage that yielded three children, Glen and Linda Smith divorced. But Linda Smith's domestic problems did not end there. Glen Smith continued to terrorize her, surveilling her, attempting to break into her apartment, and assaulting her. Neighbors testified that they saw Smith strike Linda; the police were called on a number of occasions to break up their more violent scuffles.

Linda was not the only focus of Glen Smith's ire; Smith also harassed acquaintances and neighbors to whom Linda turned for protection. In one episode, Smith attempted to run down Linda's neighbors, James and Brenda Lucas, in his car, to prevent them from intervening on her behalf. On another occasion, in the summer of 1981, James Lucas confronted Glen about his abusive treatment of Linda. A fight erupted, James armed with a hammer, Glen a tire iron. Again the police were called to break up the fight.

Several weeks before the incident in question, Lattimore began to date Linda Smith. In an apparent attempt to sabotage his ex-wife's new relationship, Glen Smith escalated his stalking and his assaults. Neighbors routinely observed Glen spying on Linda's apartment during the early morning hours. At one point, Glen confiscated Linda's car, presumably to prevent her from seeing Lattimore.

In the early afternoon of October 3, 1981, Linda Smith, her children, her sister Diane, and her friend Brenda Lucas gathered at Linda's Canton street apartment in the South End of Boston. Without warning, Glen Smith kicked in the door, screaming obscenities and threatening Linda. Again, the police were called to stop Glen. Linda was treated at the Boston City Hospital emergency room for head injuries she sustained when the police lock dislodged from the door during Glen's violent entrance.

At approximately 6:00 p.m. that day, Glen telephoned the Lucas' home, where Brenda, Diane, Linda, and the children were gathered. Brenda, who answered the phone, testified that Glen threatened to harm both her and her husband.

Thereafter, the women and children left Brenda's home for Diane Smith's fourth floor apartment, four buildings away, at 79 East Canton Street. For several hours, Glen was seen cruising the neighborhood streets in his car, shouting threats and obscenities in the direction of Diane's apartment.

Finally, at approximately 11:00 p.m., Smith, accompanied by his friend Robert "Red" Phillips, parked his car with a direct view into Diane's building. He continued to scream at the women who were, for all practical purposes, confined in Diane's apartment some 25 yards away.

Brenda Lucas telephoned her husband, James. A short time later, James Lucas arrived and positioned his car in front of Smith's to prevent Smith from leaving. Lucas then exited his car and confronted Smith in his. A heated argument ensued.

As the argument between James Lucas and Glen Smith escalated, Brenda Lucas arrived. Armed with a baseball bat, she swung at Smith, smashing the glass and metal bar around the driver's side window. Lattimore rushed towards the car from the driver's side.[4] He haphazardly fired six shots into Smith's car, striking Smith in his left hand and left shoulder and Phillips in the head.[5] Phillips died four days later.

## B. *Procedural History*

### 1. *The Trial*

On December 7, 1981, petitioner was indicted in Suffolk Superior Court, charged with the murder of Robert Phillips, armed assault with intent to murder, and assault and battery by means of a dangerous weapon. The defense claimed that Linda Smith had shot her husband during the melee. Counsel introduced substantial evidence about Glen Smith's violent past with his wife, his stalking, and his efforts to undermine Lattimore's relationship with Linda Smith, leading up to the events of October 3, 1981. As an alternative theory, counsel submitted written manslaughter instructions on the grounds that the facts demonstrated that the shootings were instigated by Smith who, rather than the defendant, "was intent on provoking an incident." *Lattimore*, 396 Mass. at 453, 486 N.E.2d 723.[6]

The trial court refused to instruct the jury on manslaughter. Counsel renewed

---

4. The testimony is somewhat inconsistent as to who else was present. Glen Smith testified that he did not see his ex-wife during the melee, whereas both James Lattimore and Brenda Lucas testified to having seen Linda Smith present at the time of the incident. Additionally, Glen Smith testified that a man identified only as "Cornbread" as well as Diane Smith were likewise present on the street.

5. Glen Smith testified that neither he nor Phillips ever exited the station wagon before the shooting.

6. The proposed instructions submitted by counsel are as follows:

The crime of manslaughter imports the taking of life by an act unjustified in law, but without malice aforethought which is necessary to constitute murder. Evidence has

his request just prior to the charging of the jury. This time the trial court not only refused a manslaughter instruction, but went so far as to highlight the issue and warn the jury that a manslaughter finding was entirely unwarranted:

> Homicide may be lawful or unlawful. It is lawful if done in war upon an enemy in battle. It is lawful when done by officers in execution of public justice pursuant to a proper warrant. And it may also be justifiable, and of course lawful, if it is done in necessary self-defense. But if a homicide is unlawful, it is either murder or manslaughter, depending on the circumstances of the unlawful killing. I instruct you that as far as this case is concerned, it is either murder in the first degree, murder in the second degree or not guilty. *I am not going to submit this case to you on the issue of manslaughter because there is no evidence in this case of manslaughter. So, I am not giving manslaughter to you. A manslaughter verdict is unwarranted on the evidence as you have heard it.* So, murder is the killing of another human being without legal justification or excuses, without such extenuation as may reduce the crime to manslaughter, but with what in the law is called malice aforethought. *And, as I have indicated to you, forget about manslaughter; forget about extenuating circumstances. This case either involved first degree murder, second degree murder, or not guilty.*

(emphasis added).

After the instructions, defense counsel renewed his request for a manslaughter instruction. The judge again refused.

Lattimore was convicted on all three counts and sentenced to a mandatory term of life in prison without the possibility of parole on the murder conviction and terms of not less than nine nor more than ten years on each of the other convictions to run concurrently with the life sentence.

## 2. *Post Conviction*

Petitioner's trial counsel did not represent him on appeal, which was presented directly to the Supreme Judicial Court pursuant to M.G.L. c. 278, § 33E. Appellate counsel briefed three issues regarding the improper use of peremptory challenges and the ineffective assistance of trial counsel. He never raised the issue of the trial court's failure to give the requested manslaughter instruction.

The SJC found no error, but reduced the verdict to murder in the second degree. The language of the court is significant:

> Apart from the defendant's theory that this was a case of domestic violence, the record indicates that Smith had *instigated* a neighborhood brawl. *It was Smith who, on the day of the murder assaulted his former wife.* During the day, *Smith had terrorized and harassed the neighbors.* In the evening he returned with 'Red' Phillips and drove through the area shouting obscenities. After 11:00 P.M., Smith and one of his neighbors got into a loud argument. One neighbor arrived at Smith's car with a baseball bat. Other neighbors and the defendant rushed the car. The first shots were fired. *The shots were wild and 'look[ed]*

---

been introduced tending to establish that just prior to the shooting an altercation occurred at the scene of the shooting. If you find that the deceased was killed as a result of an act of the defendant and that

such killing was committed in a sudden transport of passion or heat of blood, then the verdict should be either manslaughter or not guilty.

*like the consequences of an untoward, foolish introduction of a dangerous weapon in a fight not otherwise at a lethal pitch . . .,* but if malice is suggested, it is not the deliberated or purposeful malice of an assassin.' *The overwhelming evidence is that Smith, not the defendant, was intent on provoking an incident.*

*Lattimore,* 396 Mass. at 453–54, 486 N.E.2d 723 (citing *Commonwealth v. King,* 374 Mass. 501, 507, 373 N.E.2d 208 (1978)) (emphasis added).

On July 8, 1986, the defendant, acting *pro se,* filed a motion for new trial. In it, Lattimore, for the first time on appeal, challenged the court's failure to give a manslaughter instruction; however, he did not expressly claim ineffectiveness of appellate counsel to account for the absence of the manslaughter instruction claim in his direct appeal. The defendant also filed a motion for the appointment of counsel and a motion to amend his petition, "to grant the defendant or his appointed counsel leave to amend . . . if the need should arise."

The trial court denied all three motions on July 14, 1986, without conducting any hearings, without composing an opinion, and without even calling for responsive pleadings. Lattimore appealed and continued to press for appointed counsel on appeal.

On July 25, 1986, a single justice of the Appeals Court denied the motion for the appointment of counsel, finding that the Appeals Court lacked jurisdiction over the matter once the Supreme Judicial Court had conducted its review under M.G.L. c. 278, § 33E. Lattimore's appeal was also dismissed because the court concluded that he could not appeal without seeking leave to do so from a single justice of the SJC.

The full Appeals Court reversed in light of *Commonwealth v. Adrey,* 397 Mass. 751,

493 N.E.2d 875 (1986), which held that once a first degree murder verdict is reduced, the Single Justice Gatekeeper provision does not apply to post-conviction appellate review. The order assuming jurisdiction was upheld in *Commonwealth v. Lattimore,* 400 Mass. 1001, 507 N.E.2d 754 (1987).

On July 30, 1986, the Appeals Court, Kass, J., appointed counsel. Lattimore's new post-conviction counsel pressed four issues raised in his *pro se* motion for new trial, including the trial court's failure to instruct on manslaughter. But counsel did not claim that petitioner's original appellate counsel was ineffective for not raising on direct appeal the manslaughter instruction claim.

On December 1, 1987, the Massachusetts Appeals Court affirmed the denial of Lattimore's motion for new trial. It held that Lattimore had waived his "new" claim—the challenge to the instructions—for failing to raise it on direct appeal. Furthermore, it determined that the issue did not create a substantial risk of a miscarriage of justice to warrant overlooking his waiver and granting relief. *See Commonwealth v. Lattimore,* 25 Mass.App.Ct. 1106, 515 N.E.2d 1211 (Table) (1987).

Pursuant to Mass.R.App.P. 27.1, Lattimore filed with the Supreme Judicial Court an Application for Further Appellate Review ("AFAR"). Petitioner challenged the Appeals Court finding that the manslaughter issue had been waived, pointing for the first time to "the ineffective assistance of previously appointed appellate counsel's failure to brief or argue the issue." On January 25, 1988, the SJC denied review. *See Commonwealth v. Lattimore,* 401 Mass. 1104, 519 N.E.2d 595 (Table) (1988).

In June of 1994, Lattimore tried yet again, filing a second motion for new trial,

again *pro se*, reiterating his claim that his first appellate counsel provided ineffective assistance. On June 24, 1994, the trial court denied the motion concluding that Lattimore was barred from raising these claims for not having asserted them in earlier proceedings.

Lattimore filed his first petition for writ of habeas corpus with this Court on April 25, 1997. Pursuant to Fed.R.Civ.P. 15(a), petitioner amended his original petition to delete all but two claims upon which relief is currently sought.[7] This Court held a hearing on Lattimore's amended habeas petition on January 5, 2001, and invited further briefing to address whether Lattimore could show cause and prejudice for having procedurally defaulted his ineffective assistance of appellate counsel claim.[8]

### III. *ANALYSIS*

#### A. *Introduction*

■ Habeas review in a federal court is available as to a claim "adjudicated on the merits in State court proceedings" and only in instances affecting or involving clearly established federal, not state, law. *See Simpson v. Matesanz*, 175 F.3d 200, 205 (1st Cir.1999), quoting 28 U.S.C. § 2254(d). As I stated in *Simpson v. Matesanz*, 29 F.Supp.2d 11, 13 (D.Mass.1998):

> Out of consideration for comity and federalism, these requirements reflect the long-standing rule that a federal court will not engage in habeas review when the petitioner is being held pursuant to a state court judgment that is based on an independent and adequate state-law ground.

(citations omitted).

■ When a state court decision rests upon a finding of procedural default, it forecloses federal habeas review unless the petitioner can demonstrate cause for the default and prejudice stemming from it, or, alternatively, unless the petitioner can show that a refusal to consider the merits of the constitutional claim will work a miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

#### B. *Were Lattimore's Claims Procedurally Barred?*

Before addressing the merits of Lattimore's two claims, I must first determine whether Lattimore had fairly presented his federal challenge to a state court for review. That question involves at least three others:

1) Was his first claim—that the failure to give a manslaughter instruction violated due process—procedurally defaulted under state law because Lattimore failed to raise it on direct appeal?

2) Was the procedural default in fact the basis for the state court's denial of relief (i.e. an adequate and independent state law ground)?

3) Was there a cognizable excuse for the default and did the failure to consider the claim prejudice the defendant ("cause and prejudice")?

4) Apart from cause and prejudice, did the state court's failure to hear the merits of the constitutional claim work a miscarriage of justice?

##### 1. *Was the manslaughter instruction claim procedurally defaulted under state law?*

■ Plainly, the answer to this question is "yes." Massachusetts law requires

---

7. In his original petition, Lattimore asserted a third claim that his conviction was obtained by a jury that was unconstitutionally selected.

8. Petitioner has filed a supplemental memorandum in support of the Amended Petition for Writ of Habeas Corpus; the respondent has not replied.

criminal defendants to present all their generally known and available claims of error upon initial direct appeal. Mass. R.Crim.P. 30(c)(2).[9] Issues not raised at trial or pursued in available appellate avenues are deemed waived. *Commonwealth v. Pisa,* 384 Mass. 362, 366, 425 N.E.2d 290 (1981) (the statute requires that the defendant present all his claims of error at the earliest possible time, and failure to do so precludes relief on all grounds generally known and available at the time of trial or appeal).

Lattimore's first amended claim—that the trial court improperly refused to instruct the jury on manslaughter—was available to him at the time of his direct appeal, but was not pursued. It was raised for the first time in his initial motion for new trial.

### 2. *Was the procedural default the basis for the state court's denial of relief?*

■ If the procedural default was the basis for the state court's denial of relief, it will constitute an adequate and independent state ground to which this Court must defer. To arrive at that conclusion, I must make two determinations: (1) Whether the state has consistently applied its direct appeal requirement (i.e. an "adequate" state law ground), and (2) whether the state court waived it in the particular case by resting its decision on some other ground (i.e. an "independent" state law ground). *See Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Puleio v. Vose,* 830 F.2d 1197 (1st Cir.1987).

As to the first prong, Massachusetts has a routinely enforced and consistently applied waiver rule under Mass.R.Crim.P. 30. *E.g. Rodwell v. Commonwealth,* 432 Mass. 1016, 1018, 732 N.E.2d 287 (2000) ("If a defendant fails to raise a claim that is generally known and available at the time of trial or direct appeal or in the first motion for post-conviction relief, the claim is waived"); *Commonwealth v. Deeran,* 397 Mass. 136, 139, 490 N.E.2d 412 (1986) ("[A] defendant must assert all reasonably available grounds for post-conviction relief in his first rule 30 motion, or those claims are lost ... [t]his waiver rule applies equally to constitutional claims which could have been raised, but were not raised, in the defendant's original motion") (internal citations omitted); *see also Hall v. DiPaolo,* 986 F.2d 7, 11 (1st Cir.1993) (referring to the exercise of Rule 30 as a valid procedural bar to federal habeas review).

As to the second prong, the trial court did not waive the procedural objection by considering the merits of the manslaughter claim, though it is somewhat unclear because the court denied the motion for new trial without a hearing or findings. The Appeals Court, however, did provide a basis for affirming the trial court's denial of the motion for new trial, holding that Lattimore did not comply with Mass. R.Crim.P. 30(c)(2) and further, that "there is no risk of a miscarriage of justice in any of his newly asserted claims." *Commonwealth v. Lattimore,* Massachusetts Appeals Court No. A.C. 86–0057–CR (Memorandum and Order Under Rule 1:28, December 1, 1987).

9. Specifically, the rule reads:
 All grounds for relief claimed by a defendant under subdivisions (a) [unlawful restraint] and (b) [new trial] of this rule shall be raised by the defendant in his original or amended motion. Any grounds not so raised are waived, unless the judge in his discretion permits them to be raised in a subsequent motion, or unless such grounds could not reasonably have been raised in the original or amended motion.

The Supreme Court addressed the situation of an unexplained or inadequately explained state court denial of an appeal or collateral attack. In *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), the Court held that a district court must apply the following presumption:

> Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. If an earlier opinion fairly appears to rest primarily upon federal law, we will presume that no procedural default has been involved by a subsequent unexplained order that leaves the judgment or its consequences in place. Similarly, where . . . the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

*Id.* (citations omitted).

While the situation here—a silent lower court decision affirmed by a higher state tribunal with explanation—is the reverse of that presented in *Ylst*—an elaborate lower court decision merely affirmed by a higher court without any explanation (therefore read as simply endorsing the grounds of the lower court)—a fair reading of the Massachusetts Court of Appeals decision suggests that the procedural default was the basis for the decision. That last "reasoned opinion" affirmed the denial of the motion for new trial on the ground that Lattimore did not comply with Mass.R.Crim.P. 30(c)(2) without delving into the merits of his federal claim. *Commonwealth v. Lattimore*, Massachusetts Appeals Court No. A.C. 86–0057–CR (Memorandum and Order Under Rule 1:28, December 1, 1987).

While the Appeals Court also noted that "there is no risk of a miscarriage of justice in any of his newly asserted claims," that cursory reference does not alter my analysis. A federal habeas court defers to a state court's articulation of a state law grounds for a decision unless that decision rests "primarily" on federal law or is "interwoven" with federal law. *Coleman* 501 U.S. at 733, 111 S.Ct. 2546. The perfunctory reference to "miscarriage of justice," unaccompanied by any discussion of applicable federal or constitutional standards, is, at best, a passing evaluation of a federal question.

Indeed, it is more likely that the Court of Appeals was invoking a "miscarriage of justice" counterpart under Massachusetts *state* rather than federal law. *See Commonwealth v. Freeman*, 352 Mass. 556, 563–64, 227 N.E.2d 3 (1967). The First Circuit has held that if, after deciding that a party is procedurally barred from raising a claim, a state court nonetheless reviews the merits of a case under a state miscarriage of justice standard, that limited review does not amount to a waiver of the state procedural objection. *E.g. Tart v. Commonwealth*, 949 F.2d 490, 496 (1st Cir. 1991).[10]

Lattimore next points to the Supreme Judicial Court's decision, suggesting that the court's initial review under M.G.L. c. 278 § 33E was tantamount to an evalua-

---

10. The reasons for this approach were well articulated in *McCown v. Callahan*, 726 F.2d 1, 3–4 (1st Cir.1984):

> If federal habeas courts were too ready to find that state "miscarriage of justice" review constitutes "waiver" of the state's procedural rules, the state either would have to convert what is often a speedy reviewing task into a full scale detailed examination . . . or it would have to abandon miscarriage of justice review altogether.

tion of the merits of his manslaughter claim. Section 33E permits the Supreme Judicial Court to "review all aspects of cases regardless of the absence of claim of error" to determine whether a capital conviction so defies the weight of the evidence as to constitute a miscarriage of justice.[11] *See Commonwealth v. Cole,* 380 Mass. 30, 38, 402 N.E.2d 55 (1980). Lattimore maintains that, having reduced his conviction to second degree murder, the Supreme Judicial Court reviewed the "essence" of his federal manslaughter instruction claim, namely his degree of guilt.

I am not persuaded. In its gatekeeping function under § 33E the Supreme Judicial Court does not "seek to determine federal constitutional questions, but rather makes a determination of state law, namely, whether there has been a substantial likelihood of a miscarriage of justice." *McLaughlin v. Gabriel,* 726 F.2d 7, 9 (1st Cir.1984). Even though its plenary authority is far more comprehensive than ordinarily available to appellate courts, the Supreme Judicial Court's § 33E review could not possibly include the appraisal of every imaginable ground for relief—state or federal—that was not highlighted in an appellant's brief. (Indeed, that is why effective advocacy is so important; a reviewing court cannot reasonably be expected to

anticipate and remedy every conceivable trial error.)

Accordingly, I conclude that the state appellate court's rationale for declining to entertain Lattimore's claim on procedural grounds constituted an adequate and independent state ground to bar relief.

3. **Was there a cognizable excuse for the default and did the failure to consider the claim prejudice the defendant ("cause and prejudice")?**

a. *Cause*

 To excuse a procedural default, the cause for the default must involve an objective factor, external to the defense, that thwarted (or at least substantially obstructed) the efforts of the defendant or his counsel to obey the state's procedural rule. *See Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Magee v. Harshbarger,* 16 F.3d 469, 471 (1st Cir.1994). Two objective impediments have been identified by the Supreme Court as sufficient to constitute cause under this standard: (1) The factual or legal basis for a claim was not reasonably available to defense counsel, or (2) interference by state officials that made compliance impracticable. *Murray,* 477

---

11. M.G.L. c. 278, § 33E provides in full:

> In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence. For the purpose of such review a capital case shall mean a case in which the defendant was tried on an indictment for murder in the

> first degree and was convicted of murder in the first degree. After the entry of the appeal in a capital case and until the filing of the rescript by the supreme judicial court motions for a new trial shall be presented to that court and shall be dealt with by the full court, which may itself hear and determine such motions or remit the same to the trial judge for hearing and determination. If any motion is filed in the superior court after rescript, no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the supreme judicial court on the ground that it presents a new and substantial question which ought to be determined by the full court.

U.S. at 488, 106 S.Ct. 2639. Attorney error, as well, may constitute cause if it rises to the level of constitutionally ineffective assistance of counsel. *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *Murray,* 477 U.S. at 488, 106 S.Ct. 2639.

■ But here the analysis comes full circle. While ineffective assistance of appellate counsel can excuse the failure to raise the manslaughter claim on appeal, even *that* issue—the competence of appellate counsel—must itself be presented to the state courts in accordance with their rules. *See Murray* 477 U.S. at 488–89, 106 S.Ct. 2639; *see also Edwards v. Carpenter,* 529 U.S. at 450, 120 S.Ct. 1587 (holding that failure to comply with Ohio procedural deadline for seeking reopening of appeal due to ineffective assistance of appellate counsel could constitute procedural bar to habeas court's consideration of the claim). I conclude, as I must, that Lattimore has likewise procedurally defaulted his ineffective assistance of appellate counsel claim because he did not raise it in his motion for new trial—the earliest available opportunity to do so. *See* Mass.R.Crim.P. 30(c)(2).

What then is the "cause and prejudice" for that default? Lattimore points to the fact that he was *pro se,* that the court refused to appoint counsel on his motion for a new trial.

Plainly, that is not sufficient. Many prisoners are without counsel after their direct appeal. To say that *pro se* status alone somehow excuses procedural defaults would open the very floodgates that evolving habeas law seeks to shut.

But Lattimore's case involves much more than simply *pro se* status. In the very specific facts of this case—where a substantial issue was raised and preserved at trial, where the Supreme Judicial Court's decision reducing the verdict from first to second degree murder used language surely suggesting that a manslaughter instruction was appropriate—the trial judge's failure to appoint counsel, hold a hearing, or call for responsive pleadings of any kind, was an abuse of discretion and the kind of .external, objective factor that impeded Lattimore's compliance with Massachusetts procedure.[12]

■ To be sure, the decision whether to appoint counsel in the preparation and presentation of a new trial motion under Mass.R.Crim.P. 30(c)(5) properly remains within the discretion of the trial judge.[13] *Mains v. Commonwealth,* 433 Mass. 30, 739 N.E.2d 1125 (2000). Though the Supreme Court has held that a defendant does not have a constitutional right to counsel in state collateral proceedings, *Pennsylvania v. Finley,* 481 U.S. 551, 555–56, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), when a defendant presents a motion for a new trial which raises a colorable or meri-

---

**12.** Conceptually, my finding of sufficient cause derives from *Murray,* 477 U.S. at 488, 106 S.Ct. 2639, in the sense that the motion judge's abuse of discretion may be said to constitute interference by state officials that made compliance with the procedural rules impracticable, i.e. that the judge's error in failing to appoint counsel and conduct a hearing are objective factors, external to the defense, that substantially obstructed Lattimore's efforts to obey the state's procedural rule. In this sense, trial court error should be regarded no differently than attorney error

when either deprives a defendant of a meaningful opportunity to comply with state procedure.

**13.** Rule 30(c)(5) of the Massachusetts Rules of Criminal Procedure reads:

> The judge in his discretion may assign or appoint counsel in accordance with the provisions of these rules to represent a defendant in the preparation and presentation of motions filed under subdivisions (a) and (b) of this rule.

torious issue, "it is much the better practice to assign counsel." *Commonwealth v. Conceicao*, 388 Mass. 255, 262, 446 N.E.2d 383 (1983).[14] A court will examine a motion judge's decision whether to appoint counsel "only to determine whether there has been a significant error of law or other abuse of discretion," *Commonwealth v. Grace*, 397 Mass. 303, 307, 491 N.E.2d 246 (1986), that deprives an indigent defendant of "meaningful access ... or results in fundamental unfairness." *Conceicao*, 388 Mass. at 262–63, 446 N.E.2d 383 (citing *Lassiter v. Department of Social Servs.*, 452 U.S. 18, 24–25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *Ross v. Moffitt*, 417 U.S. 600, 616, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974)).[15]

 The decision whether to conduct a hearing under Mass.R.Crim.P. 30(c)(3) on a motion for new trial is likewise within the discretion of the motion judge[16] and reviewed under an abuse of discretion standard. *See Commonwealth v. Jenks*, 426 Mass. 582, 586, 689 N.E.2d 820 (1998); *Commonwealth v. Licata*, 412 Mass. 654, 660–61, 591 N.E.2d 672 (1992). Where an issue is raised and supported by a substantial evidentiary basis, failure to hold a hearing on a defendant's motion for new trial can rise to an abuse of discretion. *Commonwealth v. Stewart*, 383 Mass. 253, 257, 418 N.E.2d 1219 (1981); *see also Commonwealth v. Caban*, 48 Mass.App.Ct. 179, 183–84, 718 N.E.2d 882 (1999) (affidavits submitted by defendant in support of his motion for new trial raised substantial

issue as to whether trial counsel had provided ineffective assistance in failing to adequately prepare alibi witness, and thus trial judge abused her discretion in denying motion without an evidentiary hearing); *Commonwealth v. Meggs*, 30 Mass. App.Ct. 111, 114, 565 N.E.2d 1249 (1991) (substantial issue raised by motion and affidavits requires evidentiary hearing).

 In determining whether a "substantial issue" meriting a hearing has been raised, I look at the seriousness of the issue asserted and the adequacy of the defendant's showing on the issue raised, as well as how the facts asserted in the affidavits or other submissions compare with the facts presented at the trial. *Commonwealth v. Stewart*, 383 Mass. 253, 257–58, 418 N.E.2d 1219 (1981); *Commonwealth v. Smith*, 49 Mass.App.Ct. 127, 132, 726 N.E.2d 985 (2000).

 The affidavit and memorandum of law submitted by Lattimore in connection with his motion for new trial, albeit *pro se*, raised a substantial issue as to whether the trial court materially prejudiced the defendant in refusing, over repeated objection, to submit to the jury a manslaughter instruction. The trial court's initial view of the case was belied by the Supreme Judicial Court's decision. The trial judge, after all, not only refused a manslaughter instruction, but also told the jury to "forget about manslaughter, forget about extenuating circumstances," because "there is no evidence in this case of manslaughter." The Supreme Judicial Court, in

---

14. The commentary to Mass.R.Crim.P. 30(c)(5) cites the ABA Standards Relating to Post–Conviction Remedies, § 4.4 (Approved Draft, 1968), that "counsel should be assigned for those defendants whose motions demonstrate a basis for relief."

15. Significantly, the Appeals Court, on the same record, decided to appoint counsel.

16. Mass.R.Crim.P. 30(c)(3) provides:

Each moving party shall file and serve and each party opposing a motion may file and serve affidavits where appropriate in support of his respective position. The judge may rule on the issue or issues presented by such motion on the basis of the facts alleged in the affidavits without further hearing if no substantial issue is raised by the motion or affidavits.

sharp contrast, acknowledged Glen Smith's misbehavior that evening, emphasizing the fact that Smith had instigated the melee, employing words like "provoked," "instigated," and "brawl." It characterized Lattimore's shots as "wild," reflecting the "foolish introduction of a dangerous weapon in a fight."

Moreover, the trial court may well have supposed that the instruction issue had been squarely presented to the appellate courts, but it could not have known for certain. And, since it did not require the Commonwealth to answer Lattimore's petition, there is no reason to assume the court ever found out one way or another. The motions were filed on July 8, 1986; they were denied without a hearing on July 14, 1986.

Though courts often defer to the views of a motion judge who was also the trial judge, *Commonwealth v. Lo*, 428 Mass. 45, 53, 696 N.E.2d 935 (1998), such deference is less appropriate here, when a decision is made without articulating the grounds, without a hearing, without counsel, and without soliciting the respondent's reply.

That the trial court's abuses hampered Lattimore's ability to comply with Mass. R.Crim.P. 30(c)(2) is clear. Had there been a hearing, the Commonwealth would have raised the fact that the manslaughter issue had never been raised on appeal, and the court would have inquired into the circumstances. Had there been counsel, he or she would likely have amended the motion to include a claim of ineffective assistance of appellate counsel or raised it

during the hearing.[17] As elaborated more fully below, any reasonable appellate counsel reviewing the trial record would have understood the significance of the manslaughter instruction. Likewise, any reasonable appellate counsel reviewing Lattimore's original appellate brief would have noticed the conspicuous absence of the manslaughter instruction claim and raised the issue of attorney error in connection with the motion for new trial.

Therefore, I find that the "cause" excusing the procedural default of Lattimore's ineffective assistance of appellate counsel claim is the trial court's abuse of discretion in denying the motion for new trial without appointing counsel, without conducting a hearing, or seeking responsive pleadings.

### b. *Prejudice*

 Petitioner has also demonstrated actual prejudice from the defaulted ineffective assistance of appellate counsel claim. The Supreme Court has held that to establish prejudice, a petitioner must show "not merely that the errors ... created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

Lattimore has met this threshold. As discussed in greater detail below, Petitioner's ineffective assistance of appellate counsel claim is meritorious. He will be prejudiced if the procedural default pre-

---

**17.** In many ways, the circumstances surrounding Lattimore's habeas petition exemplify the paradox of the current habeas regime: The increasing complexity of the AEDPA procedural requirements have made the participation of counsel ever more necessary, yet indigent petitioners are not constitutionally guaranteed counsel in most post-conviction proceedings. I am reminded of the seminal Supreme Court case of *Douglas v. California*, 372 U.S. 353, 355, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), where, considering the necessity for appointed counsel on the first appeal as of right, Justice Douglas noted memorably: "there can be no equal justice where the kind of an appeal a man enjoys depends on the amount of money he has."

vents this Court from granting relief to which he would otherwise be entitled.

Accordingly, because Lattimore has demonstrated cause and prejudice to excuse his procedural default, this Court may consider the merits of his ineffective assistance of appellate counsel claim.[18]

### C. Appellate Counsel's Failure to Raise the Trial Court's Refusal to Instruct on Manslaughter on Direct Appeal Denied Petitioner the Effective Assistance of Counsel (Claim Two)

#### 1. Applicable Law

In *Evitts v. Lucey*, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment guarantees to state criminal defendants the right to receive effective assistance of counsel on their first appeals of right from state court convictions. 469 U.S. 387, 396, 105 S.Ct.

830, 83 L.Ed.2d 821 (1985) ("the right to effective assistance of counsel is not confined to trial, but extends also to the first appeal as of right"). However, the *Evitts* court did not determine the appropriate standard to be applied because the parties stipulated to the fact that counsel in that case was ineffective. *Evitts*, 469 U.S. at 392, 105 S.Ct. 830.

Subsequently, the Supreme Court applied the now familiar framework enunciated in *Strickland* to claims of ineffective assistance of appellate counsel. *See Smith v. Murray*, 477 U.S. 527, 535–36, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (first applying *Strickland* to claim of attorney error on appeal); *accord Smith v. Robbins*, 528 U.S. 259, 284, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (the proper standard for evaluating claim that appellate counsel was ineffective in neglecting to file a merits brief is that enunciated under *Strickland* ).[19]

**18.** Because I find that Lattimore has established both cause and prejudice to excuse his procedural default, I need not address whether he has demonstrated that a fundamental miscarriage of justice would occur if this Court did not reach the merits of his manslaughter instruction claim. Nevertheless, for the purposes of clarity, it does not appear that Lattimore has shown that "a constitutional violation has probably resulted in the conviction of one who is actually innocent," because Lattimore contests merely the degree of his legal responsibility (murder versus manslaughter) not his responsibility in fact for the unlawful act. *Murray*, 477 U.S. at 496, 106 S.Ct. 2639; *see also Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) ("actual innocence" means "factual innocence, not mere legal insufficiency"); *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Watkins v. Ponte*, 987 F.2d 27, 31 (1st Cir. 1993) (in a habeas case, "petitioner must supplement the constitutional violation with a colorable showing of factual innocence").

**19.** There has been some enduring ambiguity as to whether *Strickland* applies to a claim of ineffective assistance of appellate counsel. In *Evitts*, the Court said that it "need not decide

the content of appropriate standards for judging claims of ineffective assistance of appellate counsel. Cf. Strickland ... [citation omitted]." *Evitts*, 469 U.S. at 392, 105 S.Ct. 830. At least one judge has noted, "arguably, the 'cf.' cite to Strickland implies that the appellate standard might be different." *Claudio v. Scully*, 982 F.2d 798, 808 (2nd Cir. 1992) (Newman, J., dissenting). Furthermore, the *Evitts* Court seemed to imply that the standard for ineffectiveness on appeal might not be the same as for ineffectiveness at trial because it derived the right to effective assistance on appeal from the Due Process Clause rather than from the Sixth Amendment. Nevertheless, all the Circuits have applied the *Strickland* standard to claims of ineffectiveness of appellate counsel. *E.g. United States v. Victoria*, 876 F.2d 1009 (1st Cir.1989); *Abdurrahman v. Henderson*, 897 F.2d 71, 74 (2nd Cir.1990); *Diggs v. Owens*, 833 F.2d 439 (3rd Cir.1987); *Griffin v. Aiken*, 775 F.2d 1226 (4th Cir.1985); *Schwander v. Blackburn*, 750 F.2d 494, 501–02 (5th Cir. 1985); *Bransford v. Brown*, 806 F.2d 83 (6th Cir.1986); *Gray v. Greer*, 800 F.2d 644 (7th Cir.1986); *Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir.1987); *United States v. Birtle*, 792 F.2d 846 (9th Cir.1986); *Robison v. May-*

Thus, to prevail on a claim of ineffective assistance, petitioner must show that appellate counsel's performance was both deficient and prejudicial to his defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

### 2. *Deficient Performance*

Deficient performance is representation that falls below an objective standard of reasonableness under prevailing professional norms when considering all the circumstances. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. As there are "countless ways to provide effective assistance in any given case," courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. To overcome this presumption, the petitioner must present evidence that appellate counsel's failure to raise a claim was not an exercise of "sound appellate strategy." *Sidebottom v. Delo,* 46 F.3d 744, 759 (8th Cir.1995).

Plainly, sound representation does not mean that appellate counsel raise every colorable issue. To the contrary, " 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. at 536, 106 S.Ct. 2661 (quoting *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)).

The critical issue is whether that presumption is overcome when counsel omits issues that are considerably stronger than those presented. *See Smith v. Robbins,* 528 U.S. at 288, 120 S.Ct. 746 (citing *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986))

("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome"); *see also Clemmons v. Delo,* 124 F.3d 944, 954 (8th Cir.1997) (an attorney who has presented strong but unsuccessful claims on appeal may nonetheless deliver a deficient performance and prejudice a defendant by omitting a "deadbang winner" on appeal, i.e., an issue obvious from the trial record which would likely have impacted the outcome of the appeal had it been raised); *United States v. Butler,* 1999 WL 25555, at *2 (table) (4th Cir.1999) (citing *Kelly v. United States,* 29 F.3d 1107, 1112 (7th Cir.1994) (performance falls beneath objective standards of reasonableness when appellate counsel neglects to raise an issue that is both "obvious" and "significant")); *Mayo v. Henderson,* 13 F.3d 528, 533 (2nd Cir.1994) (noting that a counsel's pursuit of weaker rather than stronger claims on appeal may constitute ineffective assistance of counsel); *Fagan v. Washington,* 942 F.2d 1155, 1157 (7th Cir.1991) (finding ineffective assistance of appellate counsel when the attorney failed to raise a substantial claim but instead raised a weaker one); *Matire v. Wainwright,* 811 F.2d 1430, 1438 (11th Cir.1987) (appellate counsel may be ineffective where the trial error is obvious from the record and "must have leaped out upon even a casual reading of the transcript").

▮ The record is clear that: Counsel inexplicably ignored a significant and obvious issue—the trial judge's failure to instruct the jury on manslaughter—in favor of three less worthy claims.[20] As elaborated in greater detail below, the evidence

---

nard, 829 F.2d 1501 (10th Cir.1987); *Morgan v. Zant,* 743 F.2d 775, 780 (11th Cir.1984), overruled on other grounds by *Peek v. Kemp,* 784 F.2d 1479, 1494 (11th Cir.1986).

**20.** *See generally Lattimore,* 396 Mass. at 447–51, 486 N.E.2d 723. The Supreme Judicial Court required a mere four pages to dispense with Lattimore's unsubstantial claims on appeal.

surrounding the killing of Robert Phillips fairly raised the issue of voluntary manslaughter. The trial judge's refusal to so charge the jury, over the repeated requests and objections from defense counsel, constituted reversible error under Massachusetts law. There was no conceivable strategic reason to drop this issue on appeal.

Rather, Lattimore's appellate counsel chose to raise the following far weaker claims: (1) That the prosecutor systematically excluded three African–American jurors (even when the prosecutor made no objection to three other African–Americans);[21] (2) that the trial court erred in failing to remove two prospective jurors for cause and denying defendant's request for six additional peremptory challenges; and, (3) that trial counsel was ineffective for failing to articulate the proper basis for the admissibility of testimony regarding Smith's prior violent history with his ex-wife.

There was little evidence to support the first claim under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and its analog under Massachusetts state law, *Commonwealth v. Soares*, 377 Mass. 461, 479–480, 387 N.E.2d 499 (1979). The prosecutor used three of a possible sixteen peremptory challenges to exclude three African–American jurors. But, at the time the first African–American potential juror was challenged by the Commonwealth, one African–American, Lawrence A. Brown, had already been seated without challenge. The next person of color challenged by the Commonwealth, Priscilla Swift, had a member of her household who had been convicted for carrying a gun.[22] Moreover, at the time of the challenge to Ms. Swift, Mr. Brown and another African–American, Rosa Mae Spence, had already been seated. Indeed, even after the challenge to Ms. Swift, one other available African–American juror, Ernest Wells, was challenged not by the Commonwealth but by defense counsel. In short, the record is devoid of any evidence to suggest that the prosecutor misused his peremptory challenges.

Lattimore's second claim on direct appeal was equally frivolous. Two challenged jurors were connected to law enforcement officers: the first juror's brother-in-law was a retired police officer, while the second juror's brother was still in active service on a police force. As the issue of police witness credibility was immaterial to the case, there was simply no evidence of bias and no basis to challenge for cause.[23]

Nor was there an issue regarding the number of peremptory challenges. Assuming a trial judge has discretion under Mass.R.Crim.P. 20(c)(1) to grant a motion for extra peremptory challenges, trial counsel did not demonstrate that the circumstances of this case warranted extraordinary relief to ensure an impartial jury.

Finally, there is simply no basis to conclude that the performance of Lattimore's trial counsel was inadequate for having failed to articulate an appropriate basis for the admissibility of Glen Smith's testimony

---

21. With the exception of Phillips, Lattimore and all other persons previously mentioned are African–American.

22. In other words, upon objection from defense counsel, the government successfully rebutted an inference of improper motive by proffering a valid, non-discriminatory reason for exercising the challenge.

23. In any event, upon inquiry from the trial judge, the juror whose brother was an active police officer stated clearly that he would not believe the testimony of a police officer under oath in preference to that of a civilian witness under oath.

as to his previous abuse of his ex-wife.[24] Though Lattimore's case might have been bolstered had Smith himself admitted on cross-examination that he had beaten Linda (particularly after their divorce), there was considerable testimony from other witnesses that Smith physically abused his former wife over a period of years, that earlier on the day of the crimes he had injured her in the act of breaking into her apartment, and that Smith was generally a violent person. Moreover, both defense counsel as well as the prosecutor commented on Smith's violent predisposition and conduct in their closing arguments.[25] The absence of an admission from Glen Smith hardly deprived Lattimore of an otherwise available and substantial ground of defense.

### 3. Prejudice

To satisfy the prejudice prong of the *Strickland* test, a petitioner must show that there is a "reasonable probability" that, but for counsel's errors, the result of the proceeding would have been different. *Prou v. United States*, 199 F.3d 37, 48–49 (1st Cir.1999) (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). In the appellate context, the degree of prejudice required by *Strickland* will be met upon a showing by the petitioner that absent appellate counsel's deficiencies, there is a "reasonable probability" that the outcome of an appeal to the state's highest court would

have been different. *Claudio v. Scully*, 982 F.2d 798, 803 (2nd Cir.1992).

Under Massachusetts law, "instructions on voluntary manslaughter must be given if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth v. Schnopps*, 383 Mass. 178, 180, 417 N.E.2d 1213 (1981). Provocation is viewed objectively: "the jury must be able to infer that a reasonable person would have become sufficiently provoked." *Commonwealth v. Garabedian*, 399 Mass. 304, 313, 503 N.E.2d 1290 (1987).

A defendant is entitled to a jury instruction on his or her theory of the case if there is sufficient evidence to permit a reasonable juror "to credit the defendant's theory." *United States v. Josleyn*, 99 F.3d 1182, 1194 (1st Cir.1996); *see also Commonwealth v. Maskell*, 403 Mass. 111, 115–16, 526 N.E.2d 756 (1988) ("It is the province of the jury, and not that of the judge, to weigh any conflicting evidence").

To omit a required instruction is reversible error. *Commonwealth v. Chase*, 433 Mass. 293, 298, 741 N.E.2d 59 (2001) (citing *Commonwealth v. Martinez*, 393 Mass. 612, 613, 473 N.E.2d 167 (1985) (It is "well established" that if a jury would be warranted in finding the defen-

---

24. Defense counsel attempted to elicit from Glen Smith on cross-examination answers concerning Smith's physical abuse of his former wife and whether, as a result of that abuse, she had obtained a restraining order against him. In response to the Commonwealth's objection, defense counsel stated incorrectly that the evidence was admissible to impeach Glen Smith's credibility, rather than stating correctly that the evidence was admissible to establish Linda Smith's motive to kill her ex-husband.

25. Defense counsel stated that Smith's former wife had "something ... to hide," that she was repeatedly terrorized and physically abused for years, and that she was the one who had motive and opportunity to kill Smith. The prosecutor, in his closing argument, stated that there was "no question" that Smith had a reputation for violence, and that Smith "wouldn't be a nice neighbor."

dant guilty of manslaughter rather than murder it is reversible error not to give an instruction on manslaughter)); *Commonwealth v. Santo*, 375 Mass. 299, 305, 376 N.E.2d 866 (1978); *Commonwealth v. McCauley*, 355 Mass. 554, 560–62, 246 N.E.2d 425 (1969); *see also United States v. Thomas*, 895 F.2d 51, 55 (1st Cir.1990) (quoting *United States v. Leach*, 427 F.2d 1107, 1112–13 (1st Cir.1970)) ("[i]t is reversible error for the court to refuse a request to instruct as to defendant's theory of the case if there is evidence to support it").

Viewed in the light most favorable to Lattimore, *Schnopps*, 383 Mass. at 179, 417 N.E.2d 1213 ("[i]n deciding whether the judge should have charged on manslaughter, we assume the version of the facts most favorable to the defendant"), I conclude that the evidence was sufficient to establish provocation adequate for a manslaughter instruction.[26] The record establishes a pattern of terror, violence, and abuse directed by Glen Smith towards his ex-wife and her neighbors that escalated in the weeks of Linda's nascent romance with Lattimore. On the day of the shootings, Smith stormed into his ex-wife's apartment, causing her to be struck in the head by the police lock, and returned later that day, shouting obscenities and surveilling from his car the apartment where he knew his ex-wife to be staying. Smith eventually parked his car directly outside the apartment. In the context of his persistent ambushes and the assault earlier that day, neighbors justifiably perceived his presence to be threatening and approached the car. A brawl followed, rapidly devolving from accusations and threats to assaults and shattered glass, culminating finally in the shooting by Lattimore.

Lattimore knew of Smith's history with his ex-wife. The cumulative effects of the harassment and the increasingly menacing assaults could be said to have compromised an ordinary person's capacity for principled self-control.[27] A jury might plausibly conclude that Lattimore's discovery of the imbroglio produced a state of passion, anger, fear, fright or nervous excitement sufficient to cause the shooting. Voluntary manslaughter was a possible verdict; the trial judge erred in failing to so charge the jury.[28] *See Schnopps*, 383 Mass. at 181, 417 N.E.2d 1213 (reversing a verdict of first-degree murder to allow a jury instruction on voluntary manslaughter in a case where a husband killed his wife after she had taunted him); *see also California v. Berry*, 18 Cal.3d 509, 134 Cal. Rptr. 415, 556 P.2d 777, 781 (1976) (finding

**26.** Historically, "provocation manslaughter" was created under the common law of England to be a legal compromise between murder (in which case the death penalty was mandatory) and exoneration. *See* Joshua Dressler, *Rethinking Heat of Passion: A Defense in Search of a Rationale*, 73 J.Crim.L. & Criminology 421, 422–23 (1982). Over time, such provocations were statutorily enumerated and included, for example, encountering a spouse committing adultery, witnessing a serious assault or battery, an unlawful arrest, or a crime against a close relative. *See* Joshua Dressler, *Understanding Criminal Law* 477 (1987). In the modern conception, "reasonable provocation" is provocation which causes a reasonable person to lose his normal self-control. *See generally* Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 7.10(b), at 654–57 (2d ed.1986).

**27.** It is not necessary for me to determine whether Glen Smith subjectively intended to provoke Linda Smith or James Lattimore. For purposes of culpability under a voluntary manslaughter theory, a fact-finder considers only the state of mind of the defendant, not the provoking victim.

**28.** Of course, the judge was not required to instruct the jury in the exact language proposed by Lattimore. *See Commonwealth v. Harris*, 376 Mass. 201, 208, 380 N.E.2d 642 (1978).

prejudicial error to refuse instruction on voluntary manslaughter based on heat of passion due to victim's "long course of provocatory conduct").

Consider the following: If Linda Smith had done the shooting, under the same circumstances as Lattimore, is there any doubt that she would have received a manslaughter instruction? [29] Lattimore, for all intents and purposes, knowing what he knew, seeing what he saw, was in a comparable position.

Had Lattimore's counsel raised the manslaughter claim before the SJC, there is plainly a "reasonable probability" that the outcome of his direct appeal would have been different. And by failing to raise it, Lattimore's appellate counsel relinquished the possibility of his client receiving a maximum twenty-year statutory sentence for voluntary manslaughter, M.G.L. c. 265, § 13, and ensured a sentence of life imprisonment, M.G.L. c. 265, § 2.[30] Therefore, Lattimore's petition for a writ of habeas corpus is **GRANTED** on this ground.

### D. *That the Trial Court's Failure to Instruct the Jury on Voluntary Manslaughter Created a Miscarriage of Justice (Claim One)*

■ The conclusion that Lattimore's appellate counsel was constitutionally ineffective is sufficient in and of itself to warrant habeas relief. But, in addition, Lattimore presses his substantive challenge to the court's failure to give a manslaughter instruction, which I may now consider on the merits.

I evaluate the manslaughter instruction differently in this setting than I had in connection with the question of counsel's failure to raise the issue. In order to decide if the failure to raise the issue constituted ineffective assistance of counsel, I asked whether absent counsel's error there was a "reasonable probability" that the *outcome of the appeal* would have been different. I concluded that a manslaughter instruction was required as a matter of state law and that failure to instruct the jury constituted reversible error.

But when I consider the failure to instruct the jury on manslaughter directly, as an independent substantive claim, the issue is more complex. The failure to so instruct must implicate federal constitutional rights. As described below, those rights require a finding that an appropriately instructed jury most likely would have rendered a verdict on defendant's theory of the case, a far more difficult standard. The focus is on what *the jury* most likely would have done if properly instructed, not what the Appeals Court "probably" would have done had the issue

---

**29.** Just because this is a domestic abuse case does not mean that only a female victim should be able to invoke a "heat of passion" defense: both Lattimore and Linda Smith were victims of Glen Smith's abuse, albeit to varying degrees. Moreover, there is no legal justification to distinguish between a situation where a man discovers his wife in bed with another man and one likely to elicit an equivalent reaction—a man seeing his girlfriend near a street brawl and at risk from her abusive ex-husband. *See generally* Note, *The Flame Flickers, But Burns On: Modern Judicial Application of the Ancient Heat of Passion Defense,* 51 Rutgers L.Rev. 193 (1998) (detailing the stereotypical notions of both men and women that inhere in the heat of passion defense; for example, citing statistics that men who kill their wives and women who kill their husbands are generally not convicted of murder because of assumptions regarding what is taken to be typical male and female behavior).

**30.** To date, Lattimore has been incarcerated roughly twenty years for his second degree murder conviction.

been raised.[31]

In *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Supreme Court held that a defendant in a capital murder case had a constitutional due process right to have the jury instructed on a lesser-included offense where evidence supported such an instruction. The decision was based on the rationale that juries should not be presented with a Hobson's choice between acquitting a guilty person or executing a defendant whose crime is not sufficiently serious to warrant the death penalty. *Id.* at 637, 100 S.Ct. 2382.

However, the *Beck* Court specifically declined to decide whether its holding and rationale extends to non-death penalty cases. *Id.* at 638, n. 14, 100 S.Ct. 2382. The Circuits have split on this issue: only the Third Circuit has extended *Beck* to non-capital cases. *See Vujosevic v. Rafferty*, 844 F.2d 1023, 1027–28 (3rd Cir.1988).

The Fifth, Ninth, Tenth and Eleventh Circuits have explicitly declined to do so, concluding that failure to instruct on lesser-included offenses does not present a federal constitutional question for consideration on federal habeas review. *E.g. Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir.1988); *Trujillo v. Sullivan*, 815 F.2d 597, 602 (10th Cir.1987); *Perry v. Smith*, 810 F.2d 1078, 1080 (11th Cir.1987); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir.1984).[32]

The First, Sixth, Seventh and Eighth Circuits have taken a middle approach, holding that the failure to give an instruction on a lesser-included offense does not violate the Constitution unless it amounts to a fundamental miscarriage of justice. *See Robertson v. Hanks*, 140 F.3d 707, 710 (7th Cir.1998) (citing *Nichols v. Gagnon*, 710 F.2d 1267, 1269 (7th Cir.1983)); *Tata v. Carver*, 917 F.2d 670, 671 (1st Cir.1990); *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir.1990) (*en banc*);[33] *Deberry v. Wolff*, 513 F.2d 1336, 1338 (8th Cir.1975).[34]

---

**31.** In other words, whether the jury could conceivably return a manslaughter verdict is a different inquiry than whether the jury could conceivably return anything but a manslaughter verdict if properly charged.

**32.** In *Turner v. Marshall*, 63 F.3d 807, 818–19 (9th Cir.1995) the Ninth Circuit appeared to reverse course, declining to adopt a rule whether due process required a lesser included offense instruction on robbery because it "would require application of a new rule of law in a habeas corpus case," and thus violate *Teague v. Lane*, 489 U.S. 288, 316, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) ("habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to all defendants on collateral review through one of the two exceptions we have articulated"). Subsequently, in *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir.2000), the Ninth Circuit clarified its position: "we adhere to the law as stated in *Bashor*" that "the failure of a state court to instruct on a lesser offense in a non-capital case fails to present a federal con-

stitutional question and will not be considered in a federal habeas corpus proceeding."

**33.** In *Ferrazza v. Mintzes*, 735 F.2d 967, 968 (6th Cir.1984), the Sixth Circuit initially extended *Beck* to non-death penalty cases. However, the *Bagby* holding—in which the Sixth Circuit, assuming that *Beck* was grounded upon the Eighth Amendment rather than the Due Process Clause of the Fourteenth Amendment, concluded that they were not required to extend *Beck* to noncapital cases—calls into question whether *Ferrazza* is still good law in the Sixth Circuit. *See Bagby*, 894 F.2d at 796–97.

**34.** The question remains open in the Fourth Circuit and the District of Columbia Circuit. The Second Circuit declined to adopt a rule "interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases," since such a rule "would involve the announcement of a new rule" in violation of *Teague*. *See Jones v. Hoffman*, 86 F.3d 46, 48 (2nd Cir.1996).

The standard is high. To show a fundamental miscarriage of justice, petitioner must demonstrate that had the omitted instruction been given, the jury probably would have found him guilty of manslaughter rather than murder. *Rodriguez v. Scillia*, 193 F.3d 913, 917 (7th Cir.1999). Only then would the erroneous jury instruction rise to the level of constitutional magnitude, where "by itself [it] so infected the entire trial that the resulting conviction violates due process." *Grace v. Butterworth*, 635 F.2d 1, 6 (1st Cir.1980) (citing *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)).

In *Tata*, the First Circuit found that the trial court's refusal to instruct on a lesser-included offense did not rise to that level. The evidence included 111.82 grams of cocaine which had been lawfully seized from defendant's apartment. The trial judge instructed the jury only on the offense of trafficking in one hundred grams or more. The defendant was convicted on that charge.

The First Circuit rejected the defendant's argument that, because the jury could have found a lesser amount by deducting for personal use, the failure to instruct on the lesser included offense of trafficking in less than one hundred grams of cocaine violated due process. The evidence did not support defendant's theory: The quantity of drugs seized was unsuitable for personal consumption. *See Tata*, 917 F.2d at 672–73.

The facts of this case are different. Lattimore *did* introduce sufficient evidence to warrant an instruction on his theory of the case. However, I cannot make the prediction about the jury's verdict that the test requires. I cannot conclude that but for the trial judge's failure to charge on a manslaughter theory, the outcome of Lattimore's trial would have been different. Even armed with the appropriate instructions, a jury might have rejected the claim of provocation and concluded that Lattimore acted with the malice aforethought necessary to make an unlawful killing murder.[35]

Accordingly, because the failure of the trial judge to instruct on manslaughter did not result in a fundamental miscarriage of justice, Lattimore's petition for a writ of habeas corpus is **DENIED** on this ground.

## IV. *CONCLUSION*

For the reasons stated above, this Court concludes that Lattimore is entitled to federal habeas relief based upon ineffective assistance of appellate counsel, but is not entitled to habeas relief on the failure of the trial judge to give a manslaughter instruction.

Accordingly, **IT IS ORDERED** that the petition for a writ of habeas corpus is **GRANTED.** The Commonwealth must release Lattimore from custody immediately upon receipt of this Order.[36] Should

---

**35.** Under the Massachusetts model, malice may be proven by: (1) Specific intent to cause death; (2) specific intent to cause grievous bodily harm; or (3) knowledge of a reasonably prudent person that, in the circumstances known to the defendant, the defendant's act was very likely to cause death. *See Commonwealth v. Judge*, 420 Mass. 433, 437, 650 N.E.2d 1242 (1995); *Commonwealth v. Grey*, 399 Mass. 469, 470 n. 1, 505 N.E.2d 171 (1987); Massachusetts Model Jury Instructions on Homicide (1999). Though a voluntary manslaughter instruction was warranted

because a reasonable jury could possibly find mitigating factors to reduce murder to manslaughter, from the facts of this case I cannot conclude that the jury had no rational basis to find the defendant guilty of second-degree murder.

**36.** Lattimore has served his sentences for armed assault with intent to murder and assault and battery by means of a dangerous weapon, as each ran concurrently with the murder conviction.

the Commonwealth appeal this decision to the United States Court of Appeals for the First Circuit, this Order is stayed pending the disposition of that appeal.

**SO ORDERED.**