COMMONWEALTH *vs.* WILLIE JAMES KING.

Hampden. January 4, 1978. — February 24, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & ABRAMS, JJ.

*Homicide. Practice, Criminal,* Capital case.

In the case of a murder by stabbing, where it appeared that relations between the victim and the defendant prior to the crime were friendly, that the homicide occurred in the course of a "senseless brawl," that the weapon used was present fortuitously, that both the defendant and the victim were severely intoxicated, and that the judge omitted to instruct the jury about the bearing of intoxication on deliberate premeditation, a conviction of first degree murder was reduced to second degree murder in the interest of justice pursuant to G. L. c. 278, § 33E. [506-508]

INDICTMENT found and returned in the Superior Court on January 8, 1971.

The case was tried before *Noonan, J.*

*J. Russell Hodgdon (Susan J. Baronoff* with him) for the defendant.

*William T. Walsh, Jr.,* Special Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Gary Butler died of knife wounds at 5:15 P.M., December 7, 1970, twenty minutes after his arrival at Wesson Memorial Hospital in Springfield. The defendant Willie James King was tried for the murder of Butler in June, 1971. He was convicted of murder in the first degree, with a jury recommendation that the death penalty be not imposed. Accordingly he was sentenced to life imprisonment. Appeal from the judgment under G. L. c. 278, §§ 33A-33G, reaches us after lengthy delay which is both unfortunate and ill-explained. The defendant submits that the court should exercise its dispensing power under § 33E and reduce the verdict to murder in the second degree. Sentence on that verdict would also entail life imprisonment but would admit of eligibility for consideration for parole after imprisonment for fifteen years. See *Commonwealth* v. *Williams,* 364 Mass. 145, 151 (1973).

*Substance of the trial.* We attempt to tell a connected story as it could have been found by the jury. There are difficulties in doing so. The prosecution's case (on which the defendant rested) consisted in principal part of the testimony of a witness with limited ability to articulate, Butler's younger sister, Mrs. Dorothy Scurlock, and of a witness nine years old, Butler's nephew, Maurice Williams, the son of Butler's older sister, Mrs. Jean Williams. The facts emerge spottily, with some gaps and inconsistencies.

Butler had arrived in Springfield from his home in New York two or more days before December 7, a Monday. He was visiting and staying with Mrs. Williams at 16 Clifford Street. Mrs. Scurlock and her husband Wallace came to the house around 10 A.M. on the Monday and found there Butler, Mrs. Williams, and the defendant, the latter described

by Maurice Williams as "my mother's friend." Evidently this was a congenial company. They had socialized when Butler visited in Springfield around Thanksgiving day. Mr. and Mrs. Scurlock stayed until noon, Mrs. Scurlock departing to babysit for her husband's brother. From Mrs. Scurlock's testimony it appears there was considerable drinking of hard liquor during the interval of two hours or more; in particular the defendant had "many, many" drinks.

Mrs. Scurlock returned to 16 Clifford at an undetermined time, perhaps around 4 P.M. Butler was in the front room, Mrs. Williams and the defendant in the kitchen. The two sisters had some talk. At this point the defendant told Mrs. Scurlock to take Butler out of the house or get him out of there. Although she said she did not know the defendant's reason, and did not inquire, Mrs. Scurlock spoke to Butler and asked him to come home with her. Butler said he wanted to talk to his sister Jean, and so walked from the front room to the kitchen, and sat down. The defendant then, according to Mrs. Scurlock, knocked Butler out of the chair, pinned him to the floor, and got on top of him. It is not clear how much of this Mrs. Williams was present to observe. (She did not appear as a witness.)

Alarmed by the fracas, Mrs. Scurlock said she ran out of the front door of the house. She encountered a next door neighbor, Arthur Gordon, a Springfield police officer then on vacation, and his wife, as they were going up to their porch. She asked Gordon to break up the fight. Mrs. Gordon said she would call the police.

Mrs. Scurlock returned to the house. From the corner of the front room, she saw the defendant, on top of Butler, reaching in his belt or pants or clothes and bringing forth a knife which she described as a "fishknife" with a curled end, the blade being perhaps seven inches in length. She did not see the defendant strike with the knife. Mrs. Williams was not there. Again Mrs. Scurlock ran from the house, this time to the end of the block where she telephoned the police and her husband's brother. Running back to the scene, she saw Butler lying face up, bleeding, on the ground in front of 16

Clifford. Mrs. Williams was there. Again Mrs. Scurlock ran to the corner and telephoned. Again she ran back to the scene. By this time the police and an ambulance had arrived.

Officer Gordon testified that Mrs. Scurlock came from the rear of 16 Clifford as he was pulling up in his car on his driveway and asked him to break up the fight. Instead he entered his house and called the police. When he came out on his porch, he saw Butler face down on the porch of 16 Clifford, bleeding from the mouth. After returning to the telephone and calling for an ambulance, Gordon went to the area in front of 16 Clifford. Mrs. Williams was dragging Butler, trying to get him into her car. Gordon told her to leave him on the ground, an ambulance was coming. Gordon found himself standing next to Mrs. Williams. Mrs. Scurlock came up, also a man identified as the defendant. Gordon observed that the two sisters had been drinking (as did the first police officer to arrive in a cruiser). Gordon asked what had happened. The three said they didn't know. Gordon saw the defendant walk into the house, come out, and walk away out of sight. The sisters said the defendant had stabbed their brother. Gordon spoke to the arriving police. Securing the house for examination by detectives, he found four children there and put them up temporarily with neighbors.

The child Maurice testified that he had been in the house that day except for a time in the morning when he played with a friend. He said there had been a quarrel when Butler asked Mrs. Williams for a cigarette and the defendant told her not to give him any.[1] Maurice saw the defendant knock Butler out of the chair and get on top of him. Maurice said he pushed the defendant but the defendant got atop Butler again. He saw the defendant take a knife from the kitchen sink and stab Butler. Mrs. Scurlock had been there earlier but she was not there when Butler was thrown to the floor,

---

[1] At another place, Maurice said Butler had asked the defendant for a cigarette. In his opening speech the prosecutor said there was a quarrel over Butler's using bad language toward Mrs. Williams.

and he, Maurice, was alone with Butler and the defendant when the knifing took place.[2] Mrs. Williams came out of the bathroom and dragged Butler to the porch.

Autopsy revealed the following knife wounds on Butler's body: a wound in the right anterior neck near the collar bone which entered the subclavian artery and also touched the jugular vein; a wound entering just below the ribs and piercing the liver; and minor wounds: a cut on the chin, a superficial neck wound, and abrasion of hand and knuckles. The cutting of the artery resulted in massive hemorrhaging and thus in death. It appeared that neither of the penetrating wounds was deep, such as might result from a forceful stroke of a knife intended to do maximum damage. Finally, analysis of Butler's blood showed 0.33% alcohol content, enough to make a man very drunk.

As we have said, the defendant offered no evidence on his own part. After counsel's closing speeches, the defendant made an unsworn statement: "All I want to say is that I am innocent. I am telling you the truth. I didn't know that the man was killed."

The judge's instructions dealt with murder in the first degree by deliberate premeditated malice aforethought, murder in the second degree, and manslaughter. No mention was made of voluntary intoxication as tending to reduce or negate a capacity for deliberate premeditation. See *Commonwealth* v. *Appleby*, 358 Mass. 407, 415-416 (1970). The defendant's counsel saved no exceptions to the instructions.

When the jury had been out for some two hours they requested further instructions on the subject of deliberate premeditation, whereupon the judge read a second time from the well known opinion in *Commonwealth* v. *Tucker*, 189

---

[2] Mrs. Scurlock said there were no children in the house in the morning because it was a school day, but apparently she thought there were two children in the house in the afternoon. She did not mention Maurice. She said that when she was talking to Gordon and his wife, a child appeared at a window and she yelled to him to jump, but he did not. Gordon did not testify to such an incident.

Mass. 457, 486-496 (1905), again without reference to intoxication.

*Section 33E considerations.* The defendant's counsel chose not to press the claim that there was such a lack of evidence of deliberate premeditation as to have entitled the defendant to succeed on his motion for the direction of a verdict of acquittal of murder in the first degree.[3] Rather the contention now made is that evidence on the matter was unsatisfactory to the point of justifying this court in reducing the verdict to the second degree as an act of discretion under § 33E. We have taken such a course in appropriate circumstances, for example, in *Commonwealth* v. *Vanderpool,* 367 Mass. 743 (1975).

While analysis under § 33E can never be merely "a process of 'color matching'" with prior cases (*Commonwealth* v. *Coleman,* 366 Mass. 705, 715 [1975]), it is useful to consider the factors that have been influential in those decisions. We think such analysis points to lenity toward the present defendant. Butler and the defendant were acquainted before the incident, as indeed were the others figuring in it, and relations were friendly, so far as appears, until the afternoon of December 7. See *Commonwealth* v. *Jones,* 366 Mass. 805, 808 (1975). There is no certainty about the cause of the eruption, but what proof there is would indicate that it was a trivial irritation: the homicide occurred in the course of a "senseless brawl." *Commonwealth* v. *Ransom,* 358 Mass. 580, 583 (1971). See *Commonwealth* v. *Vanderpool, supra* at 750; *Commonwealth* v. *Baker,* 346 Mass. 107 (1963). Although the defendant apparently first set upon Butler, what followed was not a one-sided beating: there is indication of a scuffle both in Mrs. Scurlock's attempt to have Gordon intervene in the "fight" and in the abrasions on Butler's hands.[4] Cf. *Commonwealth* v. *Stir-*

---

[3] Exception was taken to the judge's denial of motions for a directed verdict and acquittal made at the close of the Commonwealth's case, but error was not assigned to the denial.

[4] Mrs. Scurlock, however, also said that she hadn't seen the men wrestling.

*ling,* 351 Mass. 68 (1966). The weapon used, whether it was the fishknife spoken of by Mrs. Scurlock or the kitchen knife mentioned by Maurice,[5] seems not to have been brought to the house by the defendant after any deliberative pause or with a violent or vengeful purpose, but was present fortuitously, an instrument not of design but of opportunity. Thus the case does not resemble those where, after an encounter between victim and defendant, the latter leaves and procures a weapon and returns to punish the victim. Compare *Commonwealth* v. *McInerney,* 373 Mass. 136, 154 (1977), and *Commonwealth* v. *Williams,* 364 Mass. 145, 152 (1973), with *Commonwealth* v. *Stillwell,* 366 Mass. 1, 5-6 (1974), *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 312 (1973), and *Commonwealth* v. *Pratt,* 360 Mass. 708, 715 (1972). The knife wounds themselves look like the consequences of an untoward, foolish introduction of a dangerous weapon in a fight not otherwise at a lethal pitch (see *Commonwealth* v. *Kinney,* 361 Mass. 709, 713 [1972]; *Commonwealth* v. *Baker, supra* at 117-118), but if malice is suggested, it is not the deliberated or purposeful malice of an assassin. The defendant's unsworn statement at trial seems a layman's assertion that despite the knife he did not intend to inflict any mortal injury.

Deliberate premeditation is thus a dubious conclusion on the facts even if the element of drunkenness is ignored. But alcohol was present in abundance, suffusing the case, and this further weakens the support for such a conclusion. See *Commonwealth* v. *Vanderpool, supra* at 749; *Commonwealth* v. *Jones, supra* at 807. The sodden condition of Butler is established, and there are also direct observations of the sisters. As to the defendant, we have him drinking heavily in the morning, and while it is true he could walk away from the house when it was all over, it may be noted

---

[5] The defendant suggests that a kitchen knife is the more plausible weapon, as the described fishknife could not readily be carried on one's person.

there is evidence that Butler, although certainly in a condition of severe intoxication, was still able to walk.

To all the foregoing we add the important point, which may be itself independently sufficient to call for mitigation, that the judge omitted to instruct the jury about the bearing of intoxication on the question of deliberate premeditation. We think the defendant would have been entitled on request to an instruction on the subject. Ordinarily counsel's failure to seek the charge would eliminate the question from consideration on appeal, but despite the absence of saved exceptions we have applied § 33E to reduce verdicts (or order new trials) when judges have omitted to charge on critical themes that might have affected juries and brought about different verdicts. See *Commonwealth v. Corcione,* 364 Mass. 611, 618 (1974); *Commonwealth v. Rego,* 360 Mass. 385, 393-397 (1971); *Commonwealth v. McCauley,* 355 Mass. 554, 558-562 (1969); *Commonwealth v. White,* 353 Mass. 409, 424-426 (1967). The present case is as strong for relief on this score as any of the cases just cited.[6]

On the whole we believe that discretionary action under § 33E is warranted.

The case is remanded to the Superior Court where the verdict and sentence will be vacated; a verdict of guilty of murder in the second degree will be entered and sentence imposed thereon.

*So ordered.*

---

[6] At the defendant's request, the Commonwealth consented to the inclusion in the record of a report of an examination of the defendant made shortly after his surrender, and a further report in February, 1971. See G. L. c. 123, § 100A. *From the reports it appears that except for a minor offense for which he was fined, the defendant had no criminal record. From his own statements, he seems to have had a fair employment record, although he was out of work at the time of the homicide. Then aged twenty-seven, he had been divorced in 1967; there were two children of the marriage.* See *Commonwealth v. Seit,* 373 Mass. 83, 95 (1977). But cf. *Commonwealth v. Bowman,* 373 Mass. 760, 767 (1977).