# United States Court of Appeals

## For the First Circuit

No. 01-2056

JAMES LATTIMORE,

Petitioner, Appellee,

v.

LARRY DUBOIS,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Circuit Judge,

Campbell and Bownes, Senior Circuit Judges.

Linda A. Wagner, Assistant Attorney General, Commonwealth of Massachusetts, with whom Thomas F. Reilly, Attorney General, was on brief, for appellant.
Elizabeth Prevett, Federal Defender Office, for appellee.

November 14, 2002

**CAMPBELL**, **Senior Circuit Judge**. This is an appeal brought by the Commonwealth of Massachusetts ("Commonwealth") from the district court's grant of a writ of habeas corpus to appellee James Lattimore ("Lattimore"). On April 28, 1997, Lattimore brought a petition for habeas corpus pursuant to 28 U.S.C. § 2254 (1994 & Supp. II 2002), in the United States District Court for the District of Massachusetts. He asserted that his 1983 murder conviction in the Massachusetts Superior Court violated the federal constitution because his appellate counsel had been ineffective by not complaining, on direct appeal to the Massachusetts Supreme Judicial Court ("SJC"), of the trial judge's refusal to instruct on manslaughter.[1] Rejecting the Commonwealth's contentions that Lattimore's habeas claim was time-barred and that Lattimore had not shown sufficient cause and prejudice to overcome his procedural default in not preserving the ineffective assistance issue in the Massachusetts courts, the district court granted the writ. However, the district court stayed the writ's execution so as to allow this court to determine first the Commonwealth's appeal.

---

[1] Lattimore's habeas petition also included a claim that the trial judge's refusal to instruct the jury on manslaughter created a miscarriage of justice that warranted habeas relief. The district court denied Lattimore's petition on this ground, concluding that the trial judge's decision did not result in a fundamental miscarriage of justice. Lattimore does not appeal from this portion of the district court's determination, and, accordingly, we do not address this issue on appeal.

We reverse, on the ground that Lattimore did not file his habeas petition within the one-year grace period for defendants whose convictions occurred prior to the passage of the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"). We also conclude that there is no basis for equitable tolling of the grace period, given the many years available to Lattimore for filing a habeas petition, his failure to show sufficient cause for his state procedural default, and, in the end, the lack of merit of his ineffective assistance of counsel claim.

## I.      Procedural Background

### A.    State Proceedings

Lattimore was indicted by a grand jury for the first-degree murder of Robert E. Phillips ("Phillips"), armed assault with intent to murder Glen Smith, and assault and battery with a dangerous weapon upon Glen Smith ("Smith"). On June 30, 1983, after a five-day jury trial in the Massachusetts Superior Court, Lattimore was found guilty as charged on each of the counts. He was sentenced to life imprisonment for first degree murder. He was also sentenced concurrently to nine to ten years imprisonment for the armed assault with intent to murder and the assault and battery with a dangerous weapon.

The facts presented below are taken from the opinion of the SJC in Commonwealth v. Lattimore, 486 N.E.2d 724, 727-28 (Mass.

1985), with supplementation from the state trial record.[2]  The shooting for which Lattimore was convicted arose from what the SJC described as a "neighborhood brawl."  Id. at 727.  Smith was the divorced husband of Linda Smith ("Linda") whom Lattimore had been dating for several weeks prior to the murder.  Testimony at trial revealed that Smith had physically abused Linda over a period of years, both during their marriage and after their divorce.  There was evidence that during the week prior to the homicide Smith sometimes surveilled his ex-wife's apartment from his parked car and had spoken with Lattimore about the latter's relationship with Linda.  In the early afternoon on October 3, 1981, Smith went to Linda's apartment and broke down the door.  Linda was struck and apparently bruised by the door.  Diane Smith, Smith's sister-in-law, and Brenda Lucas, a friend who lived in the same building as Linda, were in Linda's apartment when Smith forced his way in.  Both women witnessed and testified to the incident.  Lattimore was not present.  Diane Smith called the police.  Linda went to the Boston City Hospital emergency room where she was treated and released later that afternoon.  Smith, after leaving, made a telephone call to Brenda Lucas castigating her for sheltering Linda and also threatening her husband and Diane Smith's husband for

_____

[2] Lattimore does not challenge the state court's factual findings.  See 28 U.S.C. § 2254(e)(1) (determination of factual issues made by a state court presumed correct unless rebutted by clear and convincing evidence).

-4-

their roles in assisting Linda. Linda, meanwhile, had returned from the hospital and was present with the others through the early evening but left several hours prior to the homicide.

Later that evening, Smith returned in his car with Phillips as a passenger. He circled Diane Smith's apartment building and the nearby building where Linda and the Lucases lived, shouting threats and obscenities reflecting his anger at those who had been helping Linda. At 11 p.m., Brenda Lucas called her husband, James Lucas, at work to alert him to Smith's conduct, specifically that Smith had threatened Brenda for becoming involved in the dispute between him and Linda earlier that afternoon. Shortly after 11 p.m., when James Lucas returned from work, his wife pointed out Smith who was sitting in his parked car with Phillips in a location near Diane Smith's apartment. Lucas drove over to Smith's car where Smith sat, and demanded to know why Smith was harassing the Lucases. Meanwhile Brenda Lucas (who was in Diane Smith's apartment at the time) raced downstairs and ran to the Smith vehicle carrying a baseball bat. No physical fight erupted, however, and James Lucas's testimony suggests he felt the altercation was calming down.

Suddenly, shots were fired. According to Smith's trial testimony, Lattimore had approached Smith's car from behind, on the driver's side and, without warning, shot several times through the back driver's-side window. Two bullets struck Smith, one lodged in

his back and the other passed through his hand. Another bullet struck Phillips behind his ear, wounding him critically. Phillips died several days later of the gunshot wound. Smith, to the police and in his trial testimony, identified Lattimore positively as the shooter of both men. Both Brenda Lucas and her husband James testified to seeing Lattimore at the time they heard the shots; according to them, he was standing behind James Lucas on the driver's side. Neither saw a gun nor saw Lattimore shoot, but the shots came from where he was standing. Brenda Lucas testified to also seeing Linda Smith standing close to Lattimore at this moment. Her husband said that he did not see Linda at the scene; it was dark at the time. No witnesses testified that Lattimore had been present at any of the day's events prior to his appearance at the shooting, nor was there evidence of any conversation between him and the victims before he shot.

Lattimore's theory of defense, as argued by his counsel to the jury (Lattimore himself did not testify), was that Linda Smith, and not Lattimore, must have pulled the trigger (although no witness testified to having seen Linda do so). Lattimore presented no witnesses of his own other than an investigator who testified to being earlier told by James Lucas that Lucas had seen Linda at the homicide scene. Lattimore's counsel, however, cross-examined the government's witnesses intensively, in particular the two Lucases, Diane Smith and Smith. All witnesses, except Smith, emphasized

Glen Smith's violent behavior towards Linda for many years, and Smith himself testified to his frequent surveillance of his ex-wife's apartment. Only Brenda Lucas testified to seeing Linda standing in the dark next to Lattimore at the shooting. Lattimore's counsel also brought out that his investigator had sought to interview Linda prior to the trial but had been told by her that, on advice of counsel, she would not talk about the shooting. The prosecution sought to secure Linda's presence at trial but could not locate her.

Although counsel urged, therefore, that Lattimore was not guilty of having committed the homicide, defense counsel also requested the trial judge to give a manslaughter instruction. The following dialogue between the trial judge and defense counsel ensued:

COURT:      I am only going to send this case to the jury on either first-degree or second-degree murder or not guilty. I am not going to charge on manslaughter. There's no evidence of manslaughter here. I think you agree to that, won't you sir?

COUNSEL:    Well, Your Honor, most respectfully, I would suggest to the court that, based on the testimony of the feelings between Glen Smith and his wife that day and the relationship that seems to have been established with Mr. Lattimore, this could have been done - and obviously it is the position of the defense that it was not done by Mr. Lattimore - it could have been done in the heat of passion.

-7-

```
COURT:          I don't think there is any evidence that,
                of heat of passion, here.  Even if Linda
                Smith were on trial, based on the present
                evidence, a judge couldn't charge on
                manslaughter with respect to her, even if
                she were on trial.

COUNSEL:        Is it the Court's position that, because
                of the time factor, it's too far removed.

COURT:          Oh, certainly.  I just don't see any
                evidence here of adequate -

COUNSEL:        All right.  I would respectfully request
                my rights be preserved.
```

Lattimore appealed directly from his conviction to the SJC.  He was represented on his appeal by a new attorney who raised four issues:  the misuse of peremptory challenges to systematically exclude members of a discreet group; the court's failure to exclude two jurors challenged for cause; the denial of Lattimore's motion for additional peremptory challenges; and ineffective assistance of counsel based on defense counsel's failure at trial to articulate a basis for the admissibility of certain evidence.  Appellate counsel did not claim as error on direct appeal that the trial judge had erred by rejecting the defense counsel's request that, besides instructing on first and second degree murder as was done, the court also instruct the jury on manslaughter.

While the SJC rejected all four of Lattimore's articulated claims of error, it provided significant relief to Lattimore through exercise of its power under Mass. Gen. Laws ch.

278, § 33E (1984)[3].  The SJC substituted a finding of murder in the second degree for that of first degree murder.  After reviewing the evidence the SJC concluded that:

> The shots were wild and "look[ed] like the consequences of an untoward, foolish introduction of a dangerous weapon in a fight not otherwise at lethal pitch . . ., but if malice is suggested, it is not deliberated or purposeful malice of an assassin." Commonwealth v. King, 374 Mass. 501, 507, 373 N.E.2d 208 (1978).

> The overwhelming evidence is that Smith, not the defendant, was intent on provoking an incident.  We believe that the weight of the evidence supports the inference that the defendant's "criminal involvement was not of the nature that judge's and juries, in weighing evidence, ordinarily equate with murder in the first degree." Commonwealth v. Williams, 364 Mass. 145, 152, 301 N.E.2d 683 (1973).

---

[3]Mass. Gen. Laws ch. 278, § 33E provides:
In a capital case . . . the supreme judicial court shall transfer the whole case for its consideration of the law and the evidence.  Upon such consideration the court may, if satisfied the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence. . . .

Review under section 33 thus operates as "a type of safety valve by ensuring review as to all aspects of the case regardless of the absence of claim of error." Commonwealth v. Cole, 402 N.E.2d 55, 60 (Mass. 1980).

Lattimore, 486 N.E.2d at 427-28. The case was remanded to the Superior Court for imposition of a finding of second degree murder and re-sentencing. Lattimore was sentenced to life imprisonment for second degree murder.

Soon thereafter, on July 1, 1986, Lattimore, acting pro se, filed a motion for a new trial in the Massachusetts Superior Court pursuant to Rule 30(b) of the Massachusetts Rules of Criminal Procedure. In his motion, Lattimore argued, inter alia, that it was error for the trial court to have refused defense counsel's request to instruct the jury on manslaughter and that the judge's charge to the jury regarding the Commonwealth's burden of proof had misstated the law. Lattimore also filed a motion for the appointment of counsel. The motions were denied by the Superior Court without a hearing.

Lattimore appealed to the Massachusetts Appeals Court from the denial of his motion for a new trial. He also requested the Massachusetts Appeals Court to appoint counsel on his behalf. The Appeals Court appointed counsel for Lattimore, as requested. Counsel reiterated the claims of errors raised in Lattimore's motion for a new trial, including that the trial judge had committed error by denying the request to instruct on manslaughter. Counsel did not, however, attempt to argue that appellate counsel had been ineffective on direct appeal to the SJC for omitting to

-10-

claim as error the trial judge's refusal to instruct on manslaughter.

The Massachusetts Appeals Court affirmed the Superior Court's denial of a new trial. In its decision, the Appeals Court noted that the issues raised in the motion for a new trial had not been raised on direct appeal. As a result, the Appeals Court concluded:

> The defendant's entire case has already been reviewed, and he has received a reduction of his verdict pursuant to Mass. Gen. Laws ch. 278, § 33E . . . . It is apparent from the record that there is no risk of a miscarriage of justice in any of his newly asserted claims.

Commonwealth v. Lattimore, 515 N.E.2d 1211 (Mass. App. Ct. 1987).

Lattimore, acting through his appointed appellate counsel, then filed an Application for Further Appellate Review ("ALOFAR") with the Supreme Judicial Court. For the first time, he argued that his counsel had rendered ineffective assistance on direct appeal to the SJC by not raising the issue of the trial court's refusal to give a manslaughter instruction. The SJC denied Lattimore's ALOFAR.

Several years later, in June 1994, Lattimore filed in the Superior Court another motion for a new trial. He asserted in that motion that the trial judge's reasonable doubt instructions had been constitutionally defective and that his appellate counsel had been ineffective in not raising the reasonable doubt error on

direct appeal. Lattimore did not, in his further new trial motion, raise the issue of ineffective assistance of counsel on direct appeal based on counsel's failure to have claimed error based upon the trial judge's refusal to instruct on manslaughter. Lattimore once more filed a motion for the appointment of counsel to assist him in his further motion for new trial. On June 24, 1994, the Superior Court entered an order refusing to act on these matters. The order stated "[i]t is clear that the present motion does not raise any issues which could not have been raised in the prior appeals [including petitioner's first motion for new trial]. Accordingly, I refused to act on this motion, and I have directed the clerk's office to make this notation on the motion." The court denied Lattimore's motion for appointment of counsel. Lattimore did not appeal.

## B. Federal Proceedings

Lattimore's petition for writ of habeas corpus under 28 U.S.C. § 2254 was entered on the docket of the District Court for the District of Massachusetts on Monday, April 28, 1997. The petition included the two related claims that petitioner had received ineffective assistance of appellate counsel because of counsel's failure to claim as error on direct appeal the state trial court's refusal to instruct on manslaughter, and that the state trial court had committed error amounting to a miscarriage of justice, see supra, note 1, when it refused to charge on

-12-

manslaughter as requested.  The civil cover sheet on the habeas petition was signed and dated Friday, April 25, 1997.

On June 10, 1997, the Commonwealth moved to dismiss the petition as time-barred under AEDPA.  AEDPA contains a statute of limitations set forth in 28 U.S.C. § 2241(d)(1) limiting to one year the time within which a person in custody pursuant to a judgment of the state court may apply for a writ of habeas corpus.[4] The time for prisoners whose state convictions became final prior to AEDPA to apply for a writ has since been held to be one year running from AEDPA's effective date, April 24, 1996.  Gaskins v. Duval, 183 F.3d 8, 9 (1st Cir. 1999).  On August 20, 1997, prior to our pronouncement in Gaskins, the district court issued an order denying the Commonwealth's motion.

---

[4]28 U.S.C. § 2244(d)(1) provides that:
 A 1-year period of limitation shall apply to an application for writ of habeas corpus by a person in custody pursuant to a judgment of a State court.  The limitation period shall run from the latest of --
     (A) the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review;
     (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
     (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
     (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

> I am not inclined to dismiss the petition
> because Mr. Lattimore filed it on April 28,
> 1997, instead of April 24, 1997 -- the date
> suggested by the respondent as the absolute
> cut-off.  Prior to AEDPA, habeas petitioners
> did not have to hew to a particular statute of
> limitations, and I decline to require such
> unduly strict adherence in Mr. Lattimore's
> case.

Lattimore v. Dubois, C.A. 97-11011-NG (D. Mass. August 20, 1997) (order denying motion to dismiss).

Having lost on the time-bar argument, the Commonwealth contended that Lattimore's habeas claims were procedurally defaulted in the state courts and that Lattimore could demonstrate neither the cause nor prejudice necessary to revive them.  The district court disagreed that Lattimore was unable to meet the stringent cause and prejudice standard.  It found adequate "cause" for the default in the Superior Court's alleged abuse of discretion when it refused to appoint counsel to assist Lattimore with his initial new trial motion, and when it did not hold a hearing on that motion.  According to the district court, "[h]ad there been a hearing the Commonwealth would have raised the fact that the manslaughter issue had never been raised on appeal . . . .  Had there been counsel he or she would likely have amended the motion to include a claim of ineffective assistance of appellate counsel or raised it during the hearing."  Lattimore v. Dubois, 152 F. Supp. 2d, 67, 83 (D. Mass. 2001).  Further, the district court concluded that Lattimore had demonstrated actual prejudice from the

-14-

defaulted ineffective assistance of appellate counsel claim. In so concluding, the court stated that:

> The record is clear that: Counsel inexplicably ignored a significant and obvious issue - the trial judge's failure to instruct the jury on manslaughter - in favor of three less worthy claims. . . . [T]he evidence surrounding the killing of Robert Phillips fairly raised the issue of voluntary manslaughter. The trial judge's refusal to so charge the jury, over the repeated requests and objections from defense counsel, constituted reversible error under Massachusetts law. There was no conceivable strategic reason to drop this issue on appeal.

Id. at 85. The court reasoned that had appellate counsel raised the failure to instruct on manslaughter on direct appeal, "there is plainly a 'reasonable probability' that the outcome of his direct appeal would have been different." Id. at 89. The district court opined:

> And by failing to raise it, Lattimore's appellate counsel relinquished the possibility of his client receiving a maximum twenty-year statutory sentence for voluntary manslaughter, M.G.L. ch. 265, § 13, and ensured a sentence of life imprisonment, M.G.L. ch. 265, § 2.

Id. Lattimore's petition for a writ of habeas corpus was granted.

The Commonwealth appealed.

## II.    Discussion

### A.    Grace Period

The Commonwealth asserts that the district court erred when it ruled that Lattimore's petition for habeas corpus,

deposited in the prison mail system on April 25, 1997, and docketed on April 28, 1997, was timely. We agree. The effective date of AEDPA, providing prisoners a one-year statute of limitations for habeas petitions, was April 24, 1996. It is established in this circuit, as elsewhere, that the grace period for prisoners whose state convictions became final prior to AEDPA to file a petition under 28 U.S.C. § 2254 is one year. Gaskins, 183 F.3d at 9. The one-year grace period runs from the date of AEDPA's enactment and ends on April 24, 1997. Rogers v. United States, 180 F.3d 349, 354 (1st Cir. 1999); see also Duncan v. Walker, 533 U.S. 167, 183 (2001) (Stevens, J., concurring) (noting that the courts of appeals "have uniformly created a 1-year grace period, running from the date of AEDPA's enactment").

Lattimore's § 2254 petition was docketed on April 28, 1997, four days after the one-year grace period expired. If Lattimore is given the benefit of the prisoner mailbox rule, see Morales-Rivera v. United States, 184 F.3d 109, 110 (1st Cir. 1999) (holding the "prisoner mailbox rule" is applicable to petitions filed pursuant to § 2254), and his petition were deemed to be filed on April 25, 1997, the date it was allegedly deposited in the prison mail system, his petition was still one day late and hence barred.[5]

_____

[5]There is nothing in the record to indicate when Lattimore deposited his petition in the prison mail system. M.C.I. Norfolk, where the petitioner is incarcerated, does not keep a log of

-16-

While Lattimore concedes that, pursuant to the current case law, his petition was untimely, he argues that at the time he filed his petition in 1997 the proper measurement of the year in this circuit had yet to be established and was insufficiently clear to exclude a petition that was filed on April 25, 1997. He says he lacked adequate notice that the grace period would end on April 24 and not April 25, 1997. To support his argument, Lattimore cites to two district courts within this circuit that opted for the April 25, 1997 date in decisions rendered after he filed his petition.

Considered as a legal argument, Lattimore's contention is without merit. Wrong guesses, even reasonable ones, as to precisely how a new statute of limitations will be authoritatively applied do not entitle a disappointed petitioner to relaxation of rules once adopted. See United States v. Marcello, 212 F.3d 1005, 1110 (7th Cir.), cert. denied, 531 U.S. 878 (2000) (denying a § 2255 motion filed one day late because of confusion over the applicable deadline). The language in AEDPA put would-be petitioners, including those with preexisting causes of action, on notice of Congress's new one-year limitations. In instances where Congress has altered an established statute of limitations, courts have commonly construed the "grace period" for preexisting claims

---

outgoing legal mail. The petition was signed and dated on Friday, April 25, 1997, and docketed on Monday, April 28, 1997. It is a fair inference that the petition was placed in the mail on April 25, 1997. The Commonwealth presented no evidence to the contrary.

to be the shorter of: (1) the original limitation period, or (2) the new, shortened limitation period, commencing from the date the statute became effective. See Rogers, 180 F.3d at 354; Brown v. Angelone, 150 F.3d 370, 375 (4th Cir. 1998); United States v. Flores, 135 F.3d 1000, 1005 (5th Cir. 1998). Under existing case law, it could be expected that someone in Lattimore's position would be allowed one year to file, measured from the effective date of the AEDPA, April 24, 1996. When a limitations period is measured in years, the last day for instituting the action is traditionally the anniversary date of the start of the limitations period. Rogers, 180 F.3d at 354 (citing Fed. R. Civ. P. 6(a)). One in Lattimore's shoes had no reason to be surprised that his petition was out of time.

We note that before Lattimore had filed his petition, two circuit courts and the Department of Justice ("DOJ") had spoken regarding the applicable "grace period." Peterson v. Demskie, 107 F.3d 92, 93 (2d Cir. 1997) (no need to accord full year); Lindh v. Murphy, 96 F.3d 856, 866 (7th Cir. 1996) (en banc), rev'd on other grounds, 521 U.S. 320 (1997) (implied period ended on April 23, 1997). The DOJ's official position, announced in a memo dated June 28, 1996, was that it would not seek to enforce the limitations period against prisoners convicted prior to AEDPA "until one year after the Act took effect - i.e. April 24, 1997." Mickens v. United States, 148 F.3d 145, 148 (2d Cir. 1998).

As a legal proposition, therefore, Lattimore's petition was too late.  We turn next to whether it could or should be tolled equitably.

### B.    Equitable Tolling

Anticipating our conclusion, Lattimore requests that his petition be remanded to the district court for consideration of his equitable tolling argument.  Bending backwards, we shall assume for purposes of argument that Lattimore preserved his equitable tolling claim below.  See Neverson v. Bissonnette, 261 F.3d 120, 127 (1st Cir. 2001) (liberally construing a pro se prisoner's petition to include an equitable tolling argument).  In his response to the Commonwealth's motion to dismiss, Lattimore argued against the application of the one-year grace period because he "has limited knowledge of the law, is a pro se litigant, and [his] freedom and liberty is controled [sic] by the Department of Corrections personal [sic], and [he has] limited access to the courts."

Even if we assume arguendo that equitable tolling would be available in an appropriate case (a proposition not so far established in this circuit), Lattimore has pointed to insufficient facts to warrant favorable application of that doctrine here.  As the party seeking to invoke the doctrine of equitable tolling, Lattimore bears the burden of establishing a basis for it.  Trenkler v. United States, 268 F.3d 16, 25 (1st Cir. 2001).  "We have made it pellucid 'that equitable tolling, if available at all,

-19-

is the exception rather than the rule; [and that] resort to its prophylaxis is deemed justified only in extraordinary circumstances.'" Donovan v. Maine, 276 F.3d 87, 93 (1st Cir. 2002). It is reserved for cases in which circumstances beyond the litigant's control have prevented him from promptly filing. Trenkler, 268 F.3d at 24; Delaney v. Matesanz, 264 F.3d 7, 15 (1st Cir. 2001). Ignorance of the law alone, even for incarcerated pro se prisoners, does not excuse an untimely filing. Delaney, 264 F.3d at 15 (citing Fisher v. Johnson, 174 F.3d 710, 714 (5th Cir. 1999), cert. denied, 531 U.S. 1164 (2001)). In this case, Lattimore had ample time to exhaust his state law claims and pursue habeas relief. Instead he waited over a decade after his direct appeals were completed before pursuing habeas relief in 1997.

Lattimore's claim, moreover, is of dubious merit. Brackett v. United States, 270 F.3d 60, 71 (1st Cir. 2001) (equitable tolling unavailable to resuscitate a claim lacking in merit), cert. denied, 122 S. Ct. 1575 (2002). The sole constitutional claim in Lattimore's habeas petition is that his state appellate counsel was ineffective for not asserting as error, on direct appeal to the SJC, the Superior Court's refusal to instruct on manslaughter.[6] Unlike the district court, we are not

---

[6]As noted earlier, supra, note 1, Lattimore did not appeal from the district court's decision that the trial court's failure to instruct on manslaughter did not create a miscarriage of justice of constitutional dimension. As a result, we do not address that claim on appeal.

persuaded of the potential strength of Lattimore's claim, nor are we persuaded that Lattimore met the cause and prejudice prerequisites.

First, it is doubtful there is cause sufficient to excuse Lattimore's procedural default in not having placed his constitutional claim properly before the state judiciary. The district court based its "cause" finding upon the Superior Court's alleged abuse of discretion under state law in refusing to appoint post-conviction counsel to assist Lattimore in that court. But Lattimore did not appeal to the Massachusetts Appeals Court from the court's refusal to appoint counsel. His failure to appeal results in a separate procedural default relative to the appointment of counsel issue. Adequate "cause" cannot rest upon a ground that has itself been procedurally defaulted, at least without identifying some additional adequate cause to justify that default. Edwards v. Carpenter, 529 U.S. 446, 453 (2000).

Second, even were Lattimore to show cause, he has not established that his appellate counsel was in fact ineffective for not raising the manslaughter instruction error on direct appeal. Murray v. Carrier, 477 U.S. 478, 488 (1986).[7] Lattimore has not

_____

[7]The same weaknesses we discuss concerning the ineffective assistance of counsel claim undermines a showing of prejudice for purposes of the procedural default analysis as well. See Prou v. United States, 199 F.3d 37, 49 (1st Cir. 1999)(concluding that the prejudice standard for ineffective assistance of counsel and the prejudice standard for procedural default "are one and the same"). The analysis for procedural default and the prejudice prong of the

demonstrated that there is a "reasonable probability" that the result of the appeal would have been different absent the attorney's purported error in not pressing the manslaughter issue. Strickland v. Washington, 466 U.S. 668, 694 (1984).

The record evidence does not make out a viable case of voluntary manslaughter as that term has so far been interpreted in Massachusetts jurisprudence. To warrant a manslaughter instruction, there must be adequate provocation for the defendant to kill. Commonwealth v. Schnopps, 417 N.E.2d 1213, 1215 (Mass. 1981). And the killing must have been in the "heat of passion." Commonwealth v. Pitts, 532 N.E.2d 34, 35 (Mass. 1989) (holding manslaughter instruction not warranted if there is no evidence that events produced a "transport of passion"). A manslaughter instruction is not warranted if evidence of either of the above is lacking. Id.

It is questionable that Smith's misconduct, in the weeks and hours prior to the shooting - extreme though it was - all aimed at individuals other than Lattimore, provided Lattimore with

---

ineffective assistance of counsel claim requires a habeas petitioner to demonstrate that the result of the appeal would have been different absent the attorney's error. Id. (citing Strickland, 466 U.S. at 694 and Strickland v. Greene, 527 U.S. 263, 285 (1999)). But rather than discuss the claim in both contexts, we proceed directly to whether the ineffective assistance of counsel claim was one upon which Lattimore might prevail.

sufficient provocation to shoot Smith and kill Phillips as he did.[8]

See Commonwealth v. Holmes, 584 N.E.2d 1150, 1153 (Mass. App. Ct. 1992). Lattimore was not present at Smith's confrontations earlier during the day of the killing nor did he engage in any sort of confrontation or conversation with the victims before he shot. Even assuming a reasonable jury might infer that, by the evening, Lattimore had been told of Smith's threats and his abusive behavior towards Linda and her supporters,[9] the mere receipt of information

_____

[8]We cannot agree with the district court that Linda Smith, who had suffered years of domestic abuse at the hands of Smith, and Lattimore, her very recent boyfriend, were "in a comparable position" for purposes of Lattimore using Smith's domestic violence against Linda as a springboard for a provocation defense under Massachusetts law. According to the district court, "[j]ust because this is a domestic abuse case does not mean that only a female victim should be able to invoke a 'heat of passion' defense: both Lattimore and Linda Smith were victims of Glen Smith's abuse." Neither the case law of Massachusetts nor the facts of this case support the theory that Lattimore, solely by virtue of his nascent relationship with Linda, had become a victim of Smith's violence towards Linda so to warrant, without more, a manslaughter instruction when, having approached Smith and Phillips from the rear, he shot them without warning. No precedent in Massachusetts case law, as it exists now or existed twenty years ago, has been called to our attention in support of such a theory. As already noted, Lattimore had been dating Linda for no more than several weeks, and there was no evidence of the quality and nature of their relationship. There was testimony that suggests that the relationship was not exclusive, and that Linda may have dated other men. We are unable to say that appellate counsel's failure to raise this theory on appeal means that his performance was constitutionally deficient.

[9]Brenda Lucas, although not her husband, testified to seeing Linda with Lattimore at the time he approached the car and emptied his revolver. This evidence, if believed, along with the other circumstances, might have implied that Linda, after leaving her friends that night, had found Lattimore and updated him on the events of the day. The evidence was otherwise clear, however, that

-23-

from others has generally been held not to be "adequate provocation" for manslaughter under Massachusetts case law. See Commonwealth v. Curtis, 632 N.E.2d 619, 628-29 (Mass. 1994); Commonwealth v. Leate, 225 N.E.2d 921, 924 (Mass. 1967); Commonwealth v. Cousins, 54 Mass. App. Ct. 1110 (2002).

And even if we were to assume that Lattimore's second-hand knowledge of Smith's prior misconduct amounted to reasonable provocation for Lattimore's homicidal actions, there was no direct evidence that Lattimore himself was so inflamed by emotion as to lose his self-control, as those terms are conventionally used in a manslaughter context. Pitts, 532 N.E.2d at 35. No evidence whatsoever was presented at trial from which a jury might determine Lattimore's subjective emotional state at the time he shot Smith and Phillips. To all outward appearances, he shot them deliberately and coldly, suggesting malice and a desire to exact revenge, rather than a loss of control resulting from an impassioned state of mind. See Commonwealth v. Medina, 723 N.E.2d 986, 995 (Mass. 2000) (no manslaughter instruction warranted where no evidence that defendant "actually, subjectively experienced [an] impassioned state of mind"). There was no evidence that Lattimore argued with Smith and Phillips or was insulted or threatened by them (or that Linda herself was insulted or threatened by them)

---

Lattimore was at no time present during Smith's misconduct during the day.

-24-

immediately before he shot them. The two victims were not armed and were sitting in Smith's car when Lattimore came from behind and shot them. A state appellate court might well conclude that for a jury to be left to infer heat of passion on this record would be to license speculation without adequate evidence as to whether defendant "actually, subjectively experienced [an] impassioned state of mind." Id.

The paucity of evidence of voluntary manslaughter, as that term has been construed under Massachusetts law, clearly raises serious doubts whether Lattimore's appellate counsel's performance was constitutionally deficient for not arguing to the SJC that the trial court erred when it refused to instruct on manslaughter. Strickland, 466 U.S. at 687. Appellate counsel is not required to raise every non-frivolous claim, but rather selects among them to maximize the likelihood of success on the merits. Smith v. Robbins, 528 U.S. 259, 288 (2000) (citing Jones v. Barnes, 463 U.S. 745 (1983)). There is little to support Lattimore's contention that the result of his appeal would have been different if his appellate counsel had pressed the manslaughter issue on direct appeal. See Strickland, 466 U.S. at 694. Given the absence of record support for a manslaughter charge, victory on appeal was unlikely.[10] We conclude, therefore, that Lattimore not only failed

---

[10]While manslaughter was not argued on direct appeal, the SJC on its own initiative, reduced the conviction from first degree to second degree murder, see, supra, note 3. It could, had it believed

-25-

to demonstrate adequate cause for his procedural default but also failed to establish that his counsel was likely ineffective for failing to raise the manslaughter instruction on direct appeal.

We see, therefore, no basis on which a finding of equitable tolling might be warranted. <u>Irwin</u> v. <u>Dep't of Veterans Affairs</u>, 498 U.S. 89, 86 (1990). Remanding this case to the district court would needlessly protract litigation and undermine the interest in the finality of state criminal convictions that AEDPA was intended to promote.

## III. Conclusion

The decision of the district court is **<u>reversed</u>** with instructions that Lattimore's petition be dismissed.

---

justice so required, have further reduced the finding to manslaughter, but did not do so, nor did the SJC discuss manslaughter at all, suggesting that manslaughter was not, at least, an obvious alternative in the circumstances.